[Civ. No. 3213.   Second Appellate District, Division Two.—September 28, 1920.]

## SARAH F. DONLEY, Respondent, v. ERWIN RAY VAN HORN, Appellant.

[1] PUBLIC LANDS—RECLAMATION ACT—WITHDRAWAL OF LANDS FROM ENTRY—EFFECT OF.—Under the act of Congress of April 2, 1909, commonly known as the Reclamation Act, authorizing the Secretary of the Interior to withdraw lands from entry in connection with the Yuma reclamation project, such withdrawal is absolute, and no right can be initiated by a settler during the life of the withdrawal order, and every such settler is but a naked trespasser.

[2] ID.—SELECTION OF LIEU LANDS—CONSTRUCTION OF ACT OF CONGRESS.—Under the act of Congress of May 2, 1914, providing for the selection of lieu lands, the Secretary of the Interior is authorized to approve a selection only when the selected land is vacant and unreserved, and if it be not vacant or unreserved, it is land for the disposition of which, by selection in lieu of land reconveyed to the United States, Congress has made no provision.

[3] ID.—DISPOSITION BY LAND DEPARTMENT—CHARACTER OF LANDS.—Land for the disposition of which Congress has made no provision is not entrusted to the disposition of the Land Department, and any patent issued therefor is void and subject to collateral attack in an action at law.

[4] ID.—VACANT LANDS—MEANING OF.—Vacant lands are such as are absolutely free, unclaimed, and unoccupied.

[5] ID.—OCCUPANCY OF LAND WITHDRAWN FROM SETTLEMENT—STATUS OF OCCUPANT—CHARACTER OF LAND.—If the occupancy be unlawful and the occupant but a mere trespasser, as is the case where the land occupied by the settler is withdrawn from settlement and entry, the land should be deemed to be vacant, notwithstanding the settler's actual occupancy, but if, during the occupancy of land that for any reason has been withdrawn from settlement and entry it again is thrown open to settlement, the settler's occupancy ceases to be unlawful and the land immediately ceases to be in the category of vacant land.

[6] ID.—RESERVED LAND—MEANING OF.—Reserved land is land that has been withheld or kept back from sale or disposition.

[7] ID.—WITHDRAWAL OF LAND UNDER RECLAMATION ACT—SELECTION AS LIEU LAND — CONTEMPORANEOUS ORDER REVOKING ORDER OF WITHDRAWAL — RELATIVE RIGHTS OF CLAIMANTS.—Where public land was withdrawn from entry pursuant to the provisions of the Reclamation Act and thereafter the defendant made entry thereon, improved the same, and applied for entry under the desert land law, and thereafter the plaintiff made a selection of such land as lieu land for school land pursuant to the act of Congress of 1914, and the Secretary of the Interior approved such selection on the day that the order withdrawing such land from entry was made, the land was not either unreserved or vacant land at the time of the approval of the lieu selection.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Reversed.

The facts are stated in the opinion of the court.

Conkling & Brown for Appellant.

Haines & Haines for Respondent.

FINLAYSON, P. J.—Plaintiff, to whom had been issued a patent to the land in controversy, sued for recovery of the premises and to quiet title. The lower court adjudged plaintiff to be the owner and entitled to possession. From this judgment defendant appeals.

The land, which is situated in Imperial County, has been in the exclusive occupancy of defendant ever since some time prior to December 26, 1911, on which date he filed in the proper office, viz., the local land office at Los Angeles, his

application to make entry under the desert land law. The land is a part of a large tract that, on April 2, 1909, was withdrawn from entry by the Secretary of the Interior in connection with the Yuma reclamation project, pursuant to authority conferred by the act of June 17, 1902 (32 Stats. at Large, p. 388), commonly known as the Reclamation Act (U. S. Comp. Stats., secs. 4700–4708). This withdrawal was under what is known as the first form of withdrawal; that is, it was the withdrawal of lands that, in the opinion of the Secretary of the Interior, may be needed in the construction and maintenance of irrigation works. [1] Such a withdrawal amounts to a legislative withdrawal, and is absolute. Until again restored to entry, the land so withdrawn is segregated from the public domain. It is excepted from the operation of public land laws and is not subject to settlement or entry. No right can be initiated by a settler during the life of the withdrawal order, and every such settler is but a naked trespasser. (*Woodcock's Case,* 38 Land Dec. 349; *Pratt's Case,* 38 Land Dec. 146; *Wolsey* v. *Chapman,* 101 U. S. 755, [25 L. Ed. 915]; *Bullard* v. *Des Moines & Ft. D. R. R. Co.,* 122 U. S. 167, [30 L. Ed. 1123, 7 Sup. Ct. Rep. 1149]; *Spencer* v. *McDougal,* 159 U. S. 63, [40 L. Ed. 76, 15 Sup. Ct. Rep. 1026]; *Scott* v. *Carew,* 196 U. S. 100, [49 L. Ed. 403, 25 Sup. Ct. Rep. 193, see, also, Rose's U. S. Notes]; *Whitehill* v. *Victorio L. & C. Co.,* 18 N. M. 520, [L. R. A. 1918D, 593, 139 Pac. 184].)

[2] On May 10, 1915, while the land still was withdrawn from entry or sale under the secretary's withdrawal order of April 2, 1909, plaintiff, who claimed to be the owner of a certain section of state school land for which the state had issued to her a patent, made selection of the land in controversy under the act of May 2, 1914 (38 U. S. Stats. 372), in lieu of her school land, and a patent of the lieu land so selected by her was issued to her by the United States on August 9, 1916. The act under which plaintiff made her lieu selection—the act of May 2, 1914—provides that "the state of California, or its grantees, may, with the approval of the Secretary of the Interior, reconvey to the United States any of the lands heretofore granted to said state in the townships authorized to be resurveyed by the act of July 1, 1912, . . . and select in lieu thereof an equal amount of vacant, unappropriated, surveyed, unreserved,

49 Cal. App.—25

nonmineral public lands within said state." It will be noticed that by the terms of this act, the Secretary of the Interior is authorized to approve a selection of land in lieu of the base land reconveyed to the United States when, and only when, the lieu land so selected is "vacant" and "unreserved." If it be not "vacant" and "unreserved," it is land for the disposition of which, by selection in lieu of land reconveyed to the United States, Congress has made no provision. [3] Land for the disposition of which Congress has made no provision is not entrusted to the disposition of the Land Department, and any patent issued therefor is void and subject to collateral attack in an action at law. (*Doolan* v. *Carr,* 125 U. S. 618, [31 L. Ed. 844, 8 Sup. Ct. Rep. 1228]; *Burfenning* v. *Chicago etc. Ry. Co.,* 163 U. S. 321, [41 L. Ed. 175, 16 Sup. Ct. Rep. 1018, see, also, Rose's U. S. Notes]; *King* v. *McAndrews,* 111 Fed. 860, [50 C. C. A. 29]; *Cucamonga Fruit-Land Co.* v. *Moir,* 83 Cal. 101, [22 Pac. 55, 23 Pac. 359]; *Edwards* v. *Rolley,* 96 Cal. 408, [31 Am. St. Rep. 234, 31 Pac. 267]; *Klauber* v. *Higgins,* 117 Cal. 451, [49 Pac. 466]; *Williams* v. *San Pedro,* 153 Cal. 44, [94 Pac. 234].) The doctrine of the cases last cited is thus stated by Mr. Justice Brewer with his usual lucidity and vigor, in *Burfenning* v. *Chicago etc. Ry. Co., supra*: "It has undoubtedly been affirmed over and over again that in the administration of the public land system of the United States questions of fact are for the consideration and judgment of the Land Department, and that its judgment thereon is final. Whether, for instance, a certain tract is swampland or not, saline land or not, mineral land or not, presents a question of fact not resting on record, dependent on oral testimony; and it cannot be doubted that the decision of the land department, one way or the other, in reference to these questions is conclusive and not open to relitigation in the courts, except in those cases of fraud, etc., which permit any determination to be re-examined. . . . But it is also equally true that when by act of Congress a tract of land has been reserved from homestead and pre-emption, or dedicated to any special purpose, proceedings in the Land Department in defiance of such reservation or dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the Land Department cannot override the expressed

will of Congress, or convey away public lands in disregard or defiance thereof."

Appellant contends that, upon the facts found by the trial court—facts that appear on the face of the record of the Land Department—the land, when respondent's lieu selection received the approval of the Secretary of the Interior, was not "vacant" and "unreserved" public land, within the meaning of the act of May 2, 1914; that, therefore, the Land Department had no authority to issue the patent, and no title passed to respondent. We are constrained to hold that this is an unescapable conclusion.

All the controlling facts in the case are disclosed by the records of the land office, copies of which were incorporated into the trial court's findings. The following summary, based upon the land office records and found by the trial court to be true, will suffice for an understanding of what we conceive to be the ultimate question in the case: Subsequently to the withdrawal of the land from entry on April 2, 1909, under the first form of withdrawal authorized by the act of June 17, 1902, viz., on March 17, 1913, the reclamation service reported to the Secretary of the Interior that certain of the lands so withdrawn, including the land in controversy, were not necessary to the reclamation project, and recommended the revocation of the withdrawal order. The day following the filing of this report, viz., March 18, 1913, the assistant secretary of the interior indorsed on the report of the reclamation service an order approving the recommendation. This indorsement did not operate as an absolute and immediate revocation of the withdrawal order of April 2, 1909. For, by the express terms of this order of March 18, 1913, so indorsed on the report of the reclamation service, the assistant secretary directed the commissioner of the general land office to ascertain whether the lands included in the report of the reclamation service had been otherwise withdrawn or reserved by law, and, if not, to cause notice to be given that they will be open to settlement and entry at times to be fixed by the commissioner. Before such notice could be given, viz., on April 17, 1913, the order of March 18, 1913, was suspended, after a copy thereof had been forwarded to the register and receiver of the Los Angeles land office. The order that the assistant secretary had so indorsed on the report of the reclamation service on

March 18, 1913, was thus suspended "pending determination of the best method of opening the lands to entry." At the date of the suspension of the order of March 18, 1913, viz., on April 17, 1913, it was further ordered that the land that plaintiff proposed to select in lieu of her state school land be not restored to entry, in order that the Land Department might effect the exchange that it was proposed to make with her if and when the bill that later was enacted as the act of May 2, 1914, should become a law. On the same day that this suspension order of April 17, 1913, was made the assistant commissioner of the general land office sent a telegram to the register and receiver of the Los Angeles land office notifying the latter that the order of March 18, 1913, revoking the withdrawal of the lands, had been suspended, and to return the revocation order to the general land office in Washington. This was done. Thereafter no attempt was made by the Land Department to revoke the original withdrawal order of April 2, 1909, in so far as the land in controversy is concerned, until November 3, 1915, on which date the first assistant Secretary of the Interior approved a report of the commissioner of the general land office recommending that, as to this land, the withdrawal order of April 2, 1909, be revoked, and that the lieu selection that plaintiff previously had made on May 10, 1915, under the act of May 2, 1914, be approved. The net result of the foregoing is that, as to the land in controversy, the withdrawal order of April 2, 1909, was in full force and effect from the time when it was made until November 3, 1915.

On December 26, 1911, defendant, as we already have stated, tendered to the local land office in Los Angeles an application to make a desert land entry on the land in controversy. This application was rejected on the ground that the land had been withdrawn from entry by the withdrawal order of April 2, 1909, and that such withdrawal was still in full force and effect. Defendant appealed successively to the commissioner of the general land office and to the Secretary of the Interior, by both of whom his right to make such entry while the land was withdrawn for irrigation works was denied. During all these times defendant was a citizen of the United States, possessed of all the qualifications essential to qualify him to make entry upon such of the public lands as might be open to entry and legal settle-

ment.  At all times since December 26, 1911, the land has been in the exclusive occupancy of defendant, who went upon it and made settlement with the intention of perfecting a title thereto under the United States land laws as soon as an application to make entry might be favorably acted upon by the Land Department.  During his occupancy he cultivated the land, and, at considerable expense, made valuable improvements thereon.  Notwithstanding his *possessio pedis* and evident good faith, defendant's occupancy, during all the time that the secretary's withdrawal order of April 2, 1909, was in force, was no better than that of a naked trespasser, and his improvements were made at his own risk. But this would not prevent his occupancy from becoming lawful, and the land removed from the category of "vacant" land, if, before any inceptive right could vest in plaintiff or other third person, the withdrawal order of April 2, 1909, should be revoked and the land again restored to settlement and entry while occupied by defendant.

On February 17, 1914, which was prior to the passage of the act of May 2, 1914, and while the land was still withdrawn from settlement or entry under the secretary's withdrawal order of April 2, 1909, plaintiff wrote a letter to the Land Department expressing a willingness to select the land in controversy in lieu of her state school land. The first assistant Secretary of the Interior, in a letter dated March 21, 1914, addressed to plaintiff, informed her that if the bill then pending in Congress, and which subsequently was enacted as the act of May 2, 1914, became a law, its provisions would enable her to make the selection.  "In the meantime," so the letter runs, "the Commissioner of the General Land Office has been directed to withhold any of the above tract that you desire to select from restoration to entry.  Should H. R. 122 be enacted into law proper steps will be taken by this Department to enable you to make selection of the land in lieu of that claimed by you under the grant from the State of California."  On November 14, 1914, the Secretary of the Interior notified the commissioner of the general land office that, in view of the fact that the department had knowledge of the character and status of the land that plaintiff desired to select under the act of May 2, 1914, the usual affidavit as to the character and status of lieu land, required by the departmental regulations to be

made by persons making such lieu selections, could be waived. The secretary also notified the commissioner to instruct the local register and receiver to transmit to the general land office at Washington, without action on their part, the papers to be filed by plaintiff in the Los Angeles office when she should make her lieu selection. The commis-sioner likewise was instructed to take prompt action upon plaintiff's deed of reconveyance and lieu selection, upon receipt thereof. On May 10, 1915, plaintiff filed in the local land office at Los Angeles her lieu land selection whereby she made selection of the land in controversy, and, at the same time, recorded a deed whereby she conveyed to the United States the base land for the lieu selection, viz., the state school land for which she held a patent from the state.

On June 27, 1915, the commissioner of the general land office transmitted to the Secretary of the Interior a written report wherein he recommended approval of plaintiff's lieu selection. This report to the Secretary of the Interior, after reciting the complications and conflicts involved in plaintiff's school section and stating that plaintiff is willing to reconvey her school land to the United States, and, in lieu thereof, select the land in controversy, and after reciting the facts showing the exact status of the land, including defendant's attempted desert land entry and his occupancy, concludes with the following recommendations: (1) That the with-drawal order of April 2, 1909, be revoked and the fixing of dates for settlement and entry waived; and (2) that plain-tiff's selection, made May 10, 1915, be approved. On No-vember 3, 1915, these recommendations were approved by the following order indorsed on the commissioner's written re-port: "Nov. 3, 1915. Approved and it is so ordered. An-drieus A. Jones, First Assistant Secretary." Thereafter, on August 9, 1916, the United States issued to plaintiff the patent under which she claims title to the land in contro-versy.

As we already have pointed out, the act under which re-spondent claims that the Land Department was authorized to issue the patent to her, the act of May 2, 1914, expressly provides that the land to be selected in lieu of the base land shall be "*vacant*," unappropriated, surveyed, *unreserved*, nonmineral public lands." And, as we have shown, if the

lieu land selected under the act be not "vacant" and "unreserved," no provision for its disposition as lieu land has been made by Congress, and any patent thereto under the act of May 2, 1914, is void and no title passes. In view of appellant's contention that, when respondent's selection was made and approved, the land was not "vacant" and "unreserved," it becomes necessary to consider the meaning of those words.

[4] "Vacant lands," says the United States circuit court of appeals in *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.*, 112 Fed. 13, [61 L. R. A. 230, 50 C. C. A. 89], "are such as are absolutely free, unclaimed, and *unoccupied.*" (Italics ours.) Public land is not vacant if it is lawfully occupied by a settler under a claim and color of right. "The land was not vacant and open to settlement . . . because it was then occupied by the defendants' grantors under a claim and color of right. It matters not that they had not at that time acquired any rights against the United States. . . . whatever his rights may be, the fact that the miner is in actual possession without having made any location at all shows that the land is not 'vacant.'" (Id.) [5] If the occupancy be unlawful and the occupant but a mere trespasser, as is the case where the land occupied by the settler is withdrawn from settlement and entry, the land, doubtless, should be deemed to be "vacant," notwithstanding the settler's actual occupancy. But if, during the occupancy of land that, for any reason, has been withdrawn from settlement and entry, it again is thrown open to settlement, the settler's occupancy ceases to be unlawful, it immediately becomes lawful, he no longer is a trespasser or intruder, and the land so occupied by him immediately ceases to be within the category of "vacant" land.

[6] Reserved land is land that has been withheld or kept back from sale or disposition. The word "reserved" is defined in the Standard Dictionary as "retained; kept back." Pending its withdrawal for the Yuma reclamation project, the land in controversy was "kept back" by the government from sale. It was withheld or reserved; it was not "unreserved" public land, within the meaning of the act of May 2, 1914. It is not necessary, as respondent contends, that, to be "reserved" land, the reservation should be of a more or less permanent character, as in the case of reservations for Indians, forests, forts, arsenals, and the like. In *Northern*

*Pacific Ry. Co.* v. *Musser-Sauntry L. & M. Co.*, 168 U. S..604, [42 L. Ed. 596, 18 Sup. Ct. Rep. 205, see, also, Rose's U. S. Notes], it was held that lands within the indemnity limits of a railroad grant that have been withdrawn from sale by order of the Secretary of the Interior until it should be known whether they would be needed to satisfy the grant, are, by the order of withdrawal, "reserved," within the meaning of a subsequent act granting lands to which the United States has "full title, not *reserved,* sold, granted, or otherwise appropriated." In the opinion in that case it was said: "The withdrawal by the secretary in aid of the grant to the state of Wisconsin was valid, and operated to withdraw the odd-numbered sections within its limits from disposal by the land officers of the government under the general land laws. The act of the secretary was in effect a reservation." In *Alberger* v. *Kingsbury,* 6 Cal. App. 93, [91 Pac. 674], it was held that an order of the Secretary of the Interior withdrawing lands from disposition pending determination of .the advisability of including them within a forest reservation, constitutes a "reservation" of such. lands, within the meaning of section 2275 of the Revised Statutes (U. S. Comp. Stats., sec. 4860.) We think it clear that from the date of the withdrawal order of April 2, 1909, made pursuant to the reclamation act of June 17, 1902, until the final unequivocal revocation of the withdrawal order on November 3, 1915, the land that respondent attempted to select under the provisions of the act of May 2, 1914, was reserved, and was not "unreserved" public land within the meaning of that act.

[7] This brings us to the ultimate question in the case, viz.: Was the land, at the time of the approval of respondent's selection, both vacant and unreserved? Her counsel say that "the revocation of the withdrawal of the selected land and the approval of the selection thereof was made by the same indorsement and at the same instant, strictly *in uno flatu.*" It evidently is respondent's contention that, notwithstanding appellant's continued and uninterrupted occupancy, with the intent to make entry just as soon as it again should be thrown open to settlement, the land continued to be "vacant" up to and including the very instant when, by the revocation of the withdrawal order and the approval of plaintiff's selection, it ceased to be re-

served and became "unreserved." This contention is based upon the claim that the revocation of the withdrawal order and the approval of plaintiff's lieu selection occurred at the same instant—as respondent's counsel put it, *"in uno flatu,"* both acts having taken place by the indorsement of the assistant secretary's approval on the written report of the commissioner of the general land office wherein the commissioner had recommended the revocation of the withdrawal order of April 2, 1909, and the approval of the lieu selection that plaintiff had made on May 10, 1915.

This claim that the revocation of the withdrawal order and the approval of respondent's lieu selection took place at the same instant, without any interval of time whatever, is the Achilles heel in respondent's contention that she acquired a right to the land under her lieu selection. If the revocation of the withdrawal order and the approval of respondent's lieu selection were so absolutely synchronous that no instant of time whatever, however short, elapsed between the revocation of the withdrawal and the approval of respondent's lieu selection, then it necessarily follows that, at the very instant when the secretary approved respondent's lieu selection, the land still was under the spell of the withdrawal order, and that, therefore, when her selection was approved the land was not "unreserved" public land subject to disposal by the Land Department under the act of May 2, 1914. If, to avoid this dilemma, some interval of time, however short, may be deemed to have elapsed between the revocation of the withdrawal order and the approval of respondent's lieu selection, notwithstanding both acts were effected by the one act of the assistant secretary in indorsing his approval on the commissioner's written recommendations, then, during that interval, however short, appellant's occupancy of the land ceased to be unlawful and he ceased to be a trespasser. At the very instant that the withdrawal order was revoked, the land became open to entry, and appellant, who had occupied the land all this time, waiting for the day when he lawfully could make entry under the public land laws, who had made valuable improvements, who, possessing the necessary qualifications, had vainly tried to enter the land under the Desert Land Act, who diligently prosecuted appeals from adverse decisions of the local land officers and the commissioner of the general land office to the Secretary

of the Interior himself, and whose every act betokens a patient awaiting of the time when he could make lawful entry under the public land laws, became a lawful settler in actual and lawful occupation, and at that very instant the land ceased to be "vacant." For these reasons we see no escape from the conclusion that, when respondent's lieu selection was approved, the land either was not unreserved or it was not vacant.

The status of the land at the time of the secretary's approval of respondent's selection is the crux of the case. That is to say, in order that title should pass to respondent under the patent issued to her August 9, 1916, it is essential that the land should have been both vacant and unreserved at the time of the secretary's approval of her lieu selection. That particular point of time, and none other, is the crucial or determinative point of time. That this is so will readily appear when we remember that at the date when respondent made her lieu selection, May 10, 1915, the land unquestionably was not "unreserved." It still was in the category of reserved land by reason of the withdrawal order of April 2, 1909, which, as to the land selected by respondent, was still unrevoked and in full force and effect. Consequently, no right in respondent, inchoate or inceptive, could attach to the land by virtue of her act of selecting it as lieu for her state school section. Unless, therefore, the land was both vacant and unreserved at the very instant of the secretary's approval of her selection—and that, we think, was an impossibility—so that the secretary's act of approval could create in her some sort of a right to the land, inchoate or inceptive, she never could acquire any right thereto. For, without doubt, when, on November 3, 1915, by revocation of the withdrawal order, the land ceased to be reserved and became "unreserved," appellant's occupancy, unless a right of some sort already had vested in respondent, immediately became a lawful occupancy, and, being lawful, the land ceased, instanter, to be "vacant," and thereby it ceased to possess one of the attributes essential to the right of disposal under the act of May 2, 1914.

Our conclusion is that the land in controversy was not subject to disposition under the act of May 2, 1914. Re-

spondent never initiated a right at a time when the land was both vacant and unreserved. And since the United States, the proprietor of the public domain, can be dispossessed of its lands only by strict compliance with some law of Congress, we conclude that no title passed under the patent issued to respondent, and that, therefore, the judgment should be reversed.

It is so ordered.

Thomas, J., and Weller, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 24, 1920.

All the Justices concurred.