**Abbott SEKAQUAPTEWA, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe and all villages, clans, and Individual members of the Hopi Tribe, Plaintiff,**

v.

**Peter MacDONALD, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on behalf of the Navajo Indian Tribe and all villages, clans, and Individual members of the Navajo Tribe, Defendant.**

**No. Civ. 74–842 Pct. WPC.**

United States District Court,
D. Arizona.

April 5, 1978.

John S. Boyden, George J. Romney, Scott
C. Pugsley of Boyden, Kennedy, Romney &

Howard, Salt Lake City, Utah, Philip E. von Ammon, Donald R. Gilbert of Fennemore, Craig, von Ammon & Udall, Phoenix, Ariz., for plaintiff.

Paul F. Eckstein, Terry E. Fenzl of Brown & Bain, Phoenix, Ariz., Richard Schifter of Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

COPPLE, District Judge.

Pursuant to 25 U.S.C. § 640d–7, the Hopi tribal chairman commenced an action in this district to determine the Hopi tribal rights and interests in the area described by the Act of June 14, 1934, 48 Stat. 960 (1934 Act). The 1934 Act describes the exterior boundaries of the Navajo Reservation in northeastern Arizona, and conveys an equitable interest in certain of these lands to the Navajo and "such other Indians as may already be located thereon." Before passage of the 1934 boundary bill, this area consisted of a patchwork of treaty, legislative, and executive order reservations.[1] The Hopi and Navajo tribes stipulate to the admission of the following map to illustrate the area.

1. The 1868 rectangle was made a part of the Navajo Reservation by treaty. Treaty with the Navajos, June 1, 1868, 15 Stat. 667. By executive order, other parcels were set apart as additions to the Navajo Reservation or for Indian purposes. *See, e. g.,* Exec. Order of Oct. 29, 1878; Exec. Order of Jan. 6, 1880; Exec. Order of May 17, 1884; Exec. Order of Jan. 8, 1900. Congress added lands to the Western Navajo Indian Reservation, and created the Canyon de Chelly National Monument. Act of May 23, 1930, 46 Stat. 378; Act of Feb. 14, 1931, 46 Stat. 1161 (codified at 16 U.S.C. §§ 445 to 445b).

Events surrounding the 1882 rectangle, although not directly related to this case, form the backdrop of this suit. The 1882 parcel was withdrawn by Executive Order of December 16, 1882, for the benefit of the Hopi tribe and "such other Indians as the Secretary of the Interior may see fit to settle thereon." The 1934 Act does not affect the status of the 1882 Reservation, which is the subject of continuing litigation in another court within this district. *See Healing v. Jones,* 210 F.Supp. 125 (D.Ariz. 1962), *aff'd,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). *Healing* documents both the bitter antagonism between the Navajo and the Hopi and the difficulties attending a judicial resolution of Navajo-Hopi land controversies. *See Hamilton v. Mac-Donald,* 503 F.2d 1138 (9th Cir. 1974).

This action is now before the Court upon the Navajos' motion to dismiss certain allegations in the amended complaint,[2] and on cross-motions for partial summary judg-

ment regarding the meaning of the 1934 Act.[3] These motions raise questions of subject matter jurisdiction and collateral estoppel, and three overlapping issues as to the construction of the 1934 Act: (1) what property was granted by the 1934 Act, (2) who are the holders of the vested equitable interests in the 1934 Act lands, and (3) what is the nature and extent of their respective holdings.[4] Each question will be discussed seriatim.

**A. Subject Matter Jurisdiction**

The original complaint, brought by the tribal chairman on behalf of the Hopi tribe, simply requests a declaration of Hopi rights in the area described by the 1934 Act. *See* 25 U.S.C. § 640d–7(a). The amended complaint differs in three ways. First, the amended complaint alleges a broader representional capacity for the tribal chairman. The chairman is now representative of the tribe, villages, clans, and individual mem-

2. Plaintiff's motion to file an amended complaint was granted in August 1977 without reaching the merits of the Navajo opposition. The defendant has not reintroduced these objections by a motion to dismiss. However, insofar as the Navajos' objections to the amended complaint rest upon jurisdictional grounds, the Court will consider these issues sua sponte.

3. Both tribes have collected and filed volumes of documents to bolster their interpretation of the 1934 Act (hereinafter cited as Navajo Ex., Hopi Ex.). These documents actually shed little light upon the meaning of the 1934 land grant. Nonetheless, both tribes have objected to the admission of certain evidence.

On a motion for summary judgment, a district court "can consider any material that would be admissible or usable at trial." C. Wright & A. Miller, Fed.Prac. and Pro.: Civil §§ 2721, 2722; 6 Moore's Fed.Prac. ¶ 56.11 [1.–8]. Of course, Rule 56 does not relieve counsel from laying a proper evidentiary foundation. *United States v. Dibble,* 429 F.2d 598 (9th Cir. 1970). For example, the Court cannot consider witness interviews presented by the Hopi tribe because they are not properly authenticated. *See* Hopi Ex. 233, 234, 235 and 236. The major objections of the tribes presented raise issues of relevancy. Statutory construction often requires a district court to explore "the circumstances under which the statute passed, the mischief at which it was aimed, and the object it was supposed to achieve." C. Sands, Statutes and Statutory Construction § 48.03 (4th

ed. 1972). Therefore, historical material bearing upon the Hopi-Navajo land disputes are relevant to this motion. Moreover, these historical documents fall within an exception to the hearsay rule. Fed.R.Evid. 803(16). However, statements made by Indian representatives or administrative officials which are not contemporaneous with the passage of the 1934 Act fall into a different category. *See Healing v. Jones,* 210 F.Supp. 125, 142–43 (D.Ariz. 1962), *aff'd,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). The 1934 land grant was applicable to the particular situation then existing, and subsequent events or interpretations cannot diminish or enlarge the effect of the 1934 Act. *Cf.* C. Sands, *supra* § 49.02. The Court will therefore not consider evidence regarding events long after passage of the 1934 Act. *See, e. g.,* Hopi Ex. 227 to 293.

Beyond these general comments, the Court need not embark on the time-consuming task of ruling on each of the over 100 exhibits objected to. The admissibility of the bulk of the documents is stipulated to. The Court will explicitly cite which documents among these that are relied upon in the text. For purposes of appeal, the Court adds that even assuming all the proffered exhibits are admitted, the Court's conclusions would not differ.

4. An understanding of these issues is aided by a general knowledge of the nature of tribal property rights. *See generally* F. Cohen, Handbook of Federal Indian Law 287–312 (N.Mex. ed. 1942).

bers of the tribe. Next, a second claim for relief requests a partition of lands the Court may find jointly held by the Navajo and Hopi. Finally, a third claim for relief asks for an accounting for all Navajo activities on land found to be exclusively or jointly held by the Hopi tribe. The Navajos argue that the amended complaint exceeds the subject matter jurisdiction conferred on the Court. 25 U.S.C. §§ 640d to 640d–20.

■ The statute granting federal jurisdiction over the Hopi-Navajo land dispute within the 1882 Reservation authorized the tribal chairman to represent both tribe, villages, clans, and individual Indians. Act of July 22, 1958, Pub. L. No. 85–547, 72 Stat. 403; *see Healing v. Jones,* 174 F.Supp. 211 (D.Ariz.1959). The jurisdictional statute for this dispute is narrower in representational terms. 25 U.S.C. § 640d–7(a) ("Either tribe, acting through the chairman of its tribal council for and on behalf of the tribe . . ."). Nonetheless, other sections of the jurisdictional statute assume a broad representational capacity. Section 640d–7(b) orders the Court to determine any lands in which the Hopi tribe, including villages, clans, and individuals, have an exclusive interest. Section 640d–17(c) authorizes supplemental actions on behalf of the tribe, villages, clans, and individual members. Construing the jurisdictional statute as a whole, the Court concludes that the alleged representational capacity is proper.

■ Section 640d–7(b) affirmatively requires the district court to partition any lands found to be jointly held by the Navajo and Hopi. The Court plainly has jurisdiction over the Hopi second claim for relief. The third claim for an accounting is more troublesome. Section 640d–17(c) allows supplemental actions "as may be necessary or desirable to insure the quiet and peaceful enjoyment of the reservation lands of the tribes . . . and to fully accomplish all objects and purposes of sections 640d to 640d–24." The Hopi tribe argues this section allows an action for an accounting.

However, section 640d–17(c) merely codifies the equitable jurisdiction of a federal court to issue ancillary bills to effectuate a court decree. *See Hamilton v. Nakai,* 453 F.2d 152, 157 (9th Cir. 1972), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972). An action for an accounting is not necessary to effectuate any decree this Court might make, or "to insure the quiet and peaceable enjoyment of the reservation lands." Moreover, the legislative directive to accomplish all purposes of the title does not detract from "the principle that the power of a court to afford a remedy must be coextensive with its jurisdiction over the subject matter." *Id.* at 156. Section 640d–7 grants the Court jurisdiction to quiet title and partition jointly held land. Damages is not the object or purpose of the jurisdictional grant. Furthermore, Congress explicitly authorized an action for an accounting in supplemental proceedings in *Healing. See* 25 U.S.C. § 640d–17(a). Congressional silence presumably bars such a remedy in this action. Indeed, it is unlikely Congress would allow a damage remedy without first ascertaining the extent and nature of the Hopi interest in the 1934 Act lands. Otherwise, if a district court ruled the Hopi tribe has an undivided one-half interest in all the 1934 Act lands, then a concomitant damage remedy probably would obliterate the Navajo treasury. Therefore, the third claim for relief will be dismissed.

## B. *Collateral Estoppel*

■ In 1951 the Hopi tribe brought an action against the United States before the Indian Claims Commission alleging the government occupied and possessed without compensation the tribe's aboriginal land. *See* 25 U.S.C. §§ 70 to 70v. "Aboriginal title" depends upon a factual determination. "[A]boriginal title must rest on actual, exclusive, and continuous use and occupancy 'for a long time' prior to the loss of the property." *Sac & Fox Tribe v. United States,* 161 Ct.Cl. 189, 315 F.2d 896, 903 (1963), *cert. denied,* 375 U.S. 921, 84 S.Ct.

266, 11 L.Ed.2d 165 (1963); *see also Strong v. United States,* 207 Ct.Cl. 254, 518 F.2d 556, 560 (1975), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975); F. Cohen, Handbook of Federal Indian Law 291–94 (N.Mex. ed. 1942). The Hopi tribe asserted an aboriginal title claim extending approximately over three-quarters of the 1934 Act lands. The Hopi action was consolidated with a petition filed by the Navajo tribe also alleging the uncompensated taking of Navajo aboriginal land.

The Indian Claims Commission denied the Hopi tribe's aboriginal title claim to all of the territory alleged. Rather, the Commission held the Hopi tribe possessed aboriginal title to a smaller area which included the 1882 Reservation. This title was extinguished without compensation as to all lands outside the 1882 Reservation when the Executive Order of December 16, 1882 issued. The Hopis' aboriginal title to land within the 1882 Reservation was extinguished partially in 1937 when the Navajo tribe was administratively settled within the area. *See Healing v. Jones,* 210 F.Supp. 125 (D.Ariz.1962), *aff'd,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). The Commission ordered the case to proceed to a determination of damages. *See Hopi Tribe v. United States,* 31 Ind.Cl.Comm. 16 (1973); *Hopi Tribe v. United States,* 23 Ind.Cl. Comm. 277 (1970).

■ The defendant claims this decision collaterally bars the Hopi tribe from asserting title to the lands litigated before the Indian Claims Commission. However, in this action the Hopi tribe seeks to quiet title to land under the doctrine of "recognized title." Recognized title differs from aboriginal title.

Where Congress has by treaty or statute conferred upon the Indians or acknowl-edged in the Indians the right to permanently occupy and use land, then the Indians have a right or title to that land which has been variously referred to in court decisions as "treaty title", "reservation title", and "acknowledged title." As noted by the Commission, there exists no one particular form for such Congressional recognition or acknowledgement of a tribe's right to occupy permanently land and that right may be established in a variety of ways.

*Miami Tribe v. United States,* 146 Ct.Cl. 421, 175 F.Supp. 926, 936 (1959). "The significance of the recognized title doctrine generally lies in the fact that a plaintiff successful on this issue need not present proof demonstrating aboriginal use and occupancy." *Strong v. United States, supra* at 563; F. Cohen, *supra* at 291–99. Therefore, the issues of fact and law before the Indian Claims Commission have no bearing whatsoever to this action. It is axiomatic that collateral estoppel does not apply to unlitigated and undetermined issues. 1b Moore's Fed. Prac. ¶ 0.443[1].

■ Nonetheless, the Navajo tribe argues that issues pertaining to the 1934 Act were decided on appeal to the Court of Claims adversely to the Hopi. The Hopi brief to the Court of Claims indicates the contrary, however.[5] The Hopi tribe argued that aboriginal title in certain lands outside the 1882 Reservation continued until 1934. The 1934 Act extinguished one-half of the Hopi interest in this territory. Hopi argument was not persuasive to the Court of Claims, who affirmed by memorandum decision the judgment of the Indian Claims Commission.[6] By necessarily concluding that Hopi aboriginal title outside the 1882 Reservation was extinguished in 1882, the Court of Claims never reached any issues concerning the 1934 Act. Collateral estoppel is inappropriate as to issues which were

---

5. The brief is reproduced at Navajo Ex. E, Appendix to Navajo Motion for Partial Summary Judgment, *Sekaquaptewa v. MacDonald,* Civ. 74–842, Docket No. 44 (April 26, 1977).

6. The memorandum decision is reproduced at Exhibit G, Appendix to Navajo Motion for Partial Summary Judgment, *Sekaquaptewa v. MacDonald,* Civ. 74–842, Docket No. 44 (April 26, 1977).

neither essential nor necessary to judgment. *Id.* Therefore, the Hopi tribe is not collaterally estopped in any respect from asserting property rights under the 1934 Act.

### C. *What Property Was Granted by the 1934 Act*

The relevant granting clause of the 1934 Act follows:

> . . . . That the exterior boundaries of the Navajo Indian Reservation, in Arizona, be, and they are hereby, defined as follows . . . [boundary description]. *All vacant, unreserved, and unappropriated public lands, including all temporary withdrawals of public lands in Arizona heretofore made for Indian purposes by Executive order or otherwise within the boundaries defined by this Act,* are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon; however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive order of December 16, 1882.

(emphasis added). Which lands were "vacant, unreserved, and unappropriated" is a question of fact not before the Court on this motion. The parties dispute which of the lands withdrawn by executive order in 1878, 1880, 1884, 1900, 1901, 1907, and 1918 were "temporary withdrawals of public lands in Arizona."

The Hopis argue that all executive order withdrawals of public land prior to June 1934 were "temporary." An executive order reservation grants an Indian tribe only a "mere temporary and cancellable possessory right." *Ute Indians v. United States,* 330 U.S. 169, 178, 67 S.Ct. 650, 654, 91 S.Ct. 823 (1947). While occupying an executive order reservation, Indians are no more than tenants at the will of the government.

> . . . the status of executive order reservations can be summarized as follows: the Indians have the exclusive right to possession but title to the lands remains with the United States. Congress has plenary authority to control use, grant adverse interests or extinguish the Indian title. In these respects, executive order reservations do not differ from treaty or statutory reservations. The one difference is that so long as Congress has not recognized compensable interests in the Indians, executive order reservations may be terminated by Congress or the Executive without payment of compensation.

*United States v. Southern Pacific Transportation Co.,* 543 F.2d 676, 687 (9th Cir. 1976). The Court agrees that a "temporary withdrawal" under the 1934 Act refers to the unique status of an executive order reservation as opposed to legislatively conferred, compensable "recognized title."[7]

---

**7.** The Navajo tribe attempts to distinguish temporary from permanent withdrawals in a more abstract manner. The argument begins with *United States v. Midwest Oil Co.,* 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915). In *Midwest Oil,* the Court held that the President had the power to withdraw public lands from potential mining claims pending further legislation. The Court found that Congress had granted this power to the Executive by a history of long acquiescence. The *Midwest Oil* Court rejected a distinction between temporary and permanent executive land withdrawals offered by the appellees.

The appellees, however, argue that the practice thus approved [by Congress in the past], related to reservations,—to cases where the land had been reserved for military or other special public purposes,—and they contend that even if the President could reserve land for a public purpose or for naval uses, it does not follow that he can withdraw land in aid of legislation. When analyzed, this proposition, in effect seeks to make a distinction between a reservation and a withdrawal,—between a reservation for a purpose not provided for by existing legislation, and a withdrawal made in aid of future legislation. It would mean that a permanent reservation for a purpose designated by the President, but not provided for by statute, would be valid, while a merely temporary withdrawal to enable Congress to legislate in the public interest would be invalid. It is only necessary to point out that, as the greater includes the

Note 7—Continued

less, the power to make permanent reservations includes power to make temporary withdrawals. For there is no distinction in principle between the two. The character of the power exerted is the same in both cases. In both, the order is made to serve the public interest, and in both the effect on the intending settler or miner is the same.

*Id.* at 475–76, 35 S.Ct. at 314. Congress has since eliminated any implied Executive withdrawal power. Fed. Land Policy and Management Act of 1976, Pub. L. No. 94–579 § 704(a), 90 Stat. 2743.

*Midwest Oil* concerned a controversy which arose before passage of the Pickett Act in 1910. Act of June 25, 1910, 36 Stat. 847 (codified at 43 U.S.C. §§ 141 to 143), *repealed* Fed. Land Policy and Management Act of 1976, Pub. L. No. 94–579 § 704(a), 90 Stat. 2743. The Pickett Act expressly authorized the President to *"temporarily withdraw* from settlement, location, sale, or entry any of the public lands . . . and reserve the same for . . . public purposes to be specified in the orders of withdrawals."* 43 U.S.C. § 141 (emphasis added). Lands withdrawn under the Pickett Act remained open to "exploration, discovery, occupation, and purchase under the mining laws." *Id.* § 142. After passage of the Pickett Act, the question arose whether the President could withdraw lands so that they would not be subject to the mining laws. Then Attorney General Robert Jackson argued that the President could withdraw lands which were not subject to mining claims. 40 Op. Att'y Gen. 73 (1941). Jackson reasoned that the Pickett Act legislated only as to temporary withdrawals, and did not touch permanent executive order withdrawals.

It is desirable to point out preliminarily that there is a recognized difference between the two kinds of withdrawals. It is true the Supreme Court stated in the *Midwest* case . . . that there was no distinction in principle between a permanent reservation and a temporary withdrawal. But it seems clear the Court was referring to the question of power, not to types of withdrawal. The Court referred to differing factual situations in which one type is used and not the other. Thus it gave instances of withdrawals in aid of legislation (pp. 476–80 [35 S.Ct. 309]), and of withdrawals for reservations for public uses (pp. 470–1 [35 S.Ct. 309]), the latter including withdrawals for the establishment of bird refuges, enlargement of Indian or military reservations, the setting aside of land for water, timber, fuel, hay, signal stations, and target ranges.

*Id.* at 76. Exploring the legislative history of the Pickett Act, Jackson concluded:

When lands are withdrawn temporarily for a purpose coming within the 1910 Act, those lands are subject to the terms of that act and accordingly said mining laws apply. If, however, the lands are not withdrawn temporarily for a purpose within the 1910 Act, but for permanent use by the Government for other and authorized uses, the mining laws made applicable to lands withdrawn under the 1910 Act do not apply . . . . *This is so notwithstanding the withdrawal now contemplated and any other permanent withdrawal may be temporary in the very broad sense that they may be subsequently revoked by the President or by Congress.*

*Id.* at 81 (emphasis added). Apparently, the Jackson view is accepted in this circuit.

Thus "temporary" and "permanent" do not have meanings in terms of time. Rather they are words which go to the nature of the withdrawal. A withdrawal of lands and their reservation for a present use rendered necessary for the discharge of the responsibilities vested in the Executive branch of the Government is said to be permanent. These reservations have been made for such purposes as post offices, military and Indian reservations, light houses, and the like. A withdrawal of lands for a public purpose, as distinguished from use, is said to be temporary.

J. Lowe, *Withdrawals and Similar Matters Affecting Public Lands*, 4 Rocky Mt.Min.L.Inst. 55, 62 (1958), *cited approvingly, United States v. Consolidated Mines & Smelting Co., Ltd.,* 455 F.2d 432, 444–45 (9th Cir. 1971).

The Jackson distinction between temporary and permanent withdrawals was echoed by Felix Cohen, acting solicitor to the Department of the Interior, in a memorandum on the "Validity of Orders Temporarily Withdrawing Public Land in Aid of Legislation Looking to the Establishment of Indian Reservations."

. . . when the word "temporary" is used with respect to withdrawals in aid of legislation, the word "temporary" is used in contradistinction to the word "permanent." The executive practice upheld in the *Midwest Oil Co.* case embraced two types of public land withdrawals—permanent withdrawals intended to be effective immediately for the purposes for which the lands were withdrawn, and temporary withdrawals such as those now under consideration, in which public land was withdrawn for the purpose of maintaining the status of the land free of private claims until such time as the Congress itself had taken action.

60 I.D. 54, 56–57 (1947). On the basis of these distinctions, the Navajo tribe argues that certain executive order withdrawals within the 1934 Act boundaries were permanent ones, and, therefore, not granted by the 1934 Act. For example, the Executive Order of October 29, 1878, states:

It is hereby ordered that the tract of country in the Territory of Arizona lying within the

The Navajo tribe argues that certain executive order withdrawals still fall outside the 1934 Act. The tribe reasons that Congress recognized title in the Navajo to some areas within the 1934 boundary bill before its passage. For example, an Appropriations Act of May 27, 1902, 32 Stat. 264, recognized a Navajo compensable interest in the area withdrawn by the Executive Order of Jan. 8, 1900. The Act of March 3, 1927, 44 Stat. 1347 (codified at 25 U.S.C. § 398d), which froze the boundaries of all executive order reservations, recognized Navajo title in other executive order reservations within the 1934 Act boundaries.

■ The issue raised is whether Congress recognized rights of permanent occupancy before the 1934 Act?

An Indian Reservation created by Executive Order of the President conveys no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President. Such rights may be terminated by the unilateral action of the United States without legal liability for compensation in any form even though Congress has permitted suit on the claim. . . . When a reservation is established by a treaty ratified by the Senate or a statute, the quality of the rights thereby secured to the occupants of the reservation depends upon the language or purpose of the Congressional action. Since Congress, under the Constitution, § 3 of Art. IV, has the power to dispose of the lands of the United States, it may convey to or recognize such rights in the Indians, even a title equal to fee simple, as in its judgment is just. . . . *When Congress intends to delegate power to turn over lands to the Indians permanently, one would expect to and doubtless would find definite indications of such a purpose.*

*Hynes v. Grimes Packing Co.,* 337 U.S. 86, 103–04, 69 S.Ct. 968, 979, 93 L.Ed. 1231 (1949) (emphasis added). The legal standard for recognized title rests upon the clear intent of Congress. "There is no particular form for congressional recognition of Indian right of permanent occupancy. It may be established in a variety of ways but there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupancy." *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 278–79, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955).

The Navajo tribe suggests that land withdrawn by the Executive Order of January 8, 1900, was permanently reserved by Congress. This congressional intent can be found in the Appropriations Act of May 27, 1902, 32 Stat. 264. This act provides for the purchase of the title of certain settlers located at Tuba City within the 1900 executive order reservation. In particular, the appropriations allowed the Secretary of the Interior to purchase the rights and improvements of about 20 Morman families at Tuba City. On its face, this statute does not

Note 7—Continued

following described boundaries . . . be, and the same hereby is, withdrawn from sale *and settlement and set apart as an addition to the present reservation for the Navajo Indians.*

The Navajo tribe characterizes this executive order withdrawal as a withdrawal for immediate present use, and, therefore, a "permanent" withdrawal.

The Court is not persuaded that the Jackson distinction is a meaningful one to apply to the 1934 Act. After all, the distinction arose from an Executive attempt to justify land withdrawals seemingly at odds with legislative directives. The 1934 Act states that "All . . temporary withdrawals of public lands in Arizona heretofore made for Indian purposes by Executive order .. . . are hereby permanently withdrawn . . . ." Considering the juxtaposition of "temporary" and "permanent" within the 1934 Act, it is reasonable to assume Congress intended to change the Indian land status from a tenancy at will to a permanent compensable interest. Although the legislative history of the 1934 Act is silent as to this question of construction, there is no indication whatsoever that any of the prior executive order withdrawals were excluded from the 1934 grant. If Congress intended to legislate as to one type of withdrawal and not to the other, the Court would expect some expression of this purpose. Therefore, the Court will not apply the Jackson distinction between permanent and temporary executive order withdrawals.

show a "definite intention by congressional action or authority to accord legal rights." Moreover, nothing in the legislative history cited by the Navajo tribe indicates such a clear purpose. Indeed, the Navajo position leads to an anomalous result. The Hopi village of Moencopi is within the 1900 executive order reservation. One stumbling block to passage of the 1934 Act was the presence of this Hopi village. The Navajo tribe would read the status of the Moencopi village completely out of the 1934 Act.

The Act of March 3, 1927, 44 Stat. 1347, states:

Changes in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress . . . .

(codified at 25 U.S.C. § 398d); see also Act of May 25, 1918, 40 Stat. 570 (codified at 25 U.S.C. § 211) ("No Indian reservations shall be created, within the limits of the States of New Mexico and Arizona, except by Act of Congress."). A law review writer has argued that the 1927 Act is a congressional recognition of compensable tribal property interests in executive order reservations. Note, *Tribal Property Interests in Executive Order Reservations: A Compensable Indian Right*, 69 Yale L.J. 627 (1960). The Navajo tribe argues the Court should adopt the views of this article. The question is one of first impression. *Cf. United States v. Southern Pacific Transportation Co., supra* at 687.

In *Healing v. Jones*, 174 F.Supp. 211 (D.Ariz.1959), the Court either implicitly rejected or overlooked the argument that compensable interests were created by the 1927 Act. The *Healing* Court held that equitable interests in the 1882 executive order reservation were not vested until congressional recognition in 1958. *Id.* at 216; Note, *supra* at 639. Whether by oversight or omission, the *Healing* Court is correct. On its face, the 1927 Act does not show a "definite intention by congressional action

or authority to accord legal rights." Rather, the Act merely limits executive rights and clearly defines congressional initiative. From the bulky legislative history of the 1927 Act, the only direct evidence as to congressional intent comes with the House Report to a prior version of the Act which was vetoed by the President on other grounds.

Nothing in this bill is intended to in any manner change or alter the ownership or legal and equitable title to the lands described by its terms. The question of what rights the Indians may have in and to Executive order reservations will not be affected by its passage and the courts can squarely decide that issue without reference to this legislation.

H.R.Rep. No. 763, 69th Cong., 1st Sess. (1926). The House and Senate Reports on the final 1927 Act are silent on the issue of recognized title. *See* S.Rep. No. 1240, 69th Cong., 2d Sess. (1927); H.R.Rep. No. 1791, 69th Cong., 2d Sess. (1927). Although the Navajo tribe can point to language of individual members of Congress expressing a concern to vest permanent rights to the Indians, these speeches are hardly dispositive. C. Sands, Statutes and Statutory Construction § 48.13. Therefore, the Court concludes that the 1927 Act recognized no compensable property interests in the Indian tribes on executive order reservations.

D. *Who are the Holders of the Vested Equitable Interests*

The granting clause of the 1934 Act states:

. . . [description of lands], are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and *such other Indians* as may already be located thereon; however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive order of December 16, 1882.

(emphasis added). As a named grantee, the Navajo tribe is one holder of the equitable

interests. The Court takes judicial notice that a Hopi village existed at Moencopi on June 14, 1934. Moencopi is within the 1934 Act land grant, and, therefore, the Hopi are within the "such other Indians" clause and are holders of equitable interests.

 The issue arises whether any other Indian tribe may be a grantee within the meaning of the 1934 Act? The Hopi tribe urges the Court to rule that, as a matter of law, the Hopi are the only "other Indians" referred to by the 1934 Act. After all, the legislative history to the 1934 Act demonstrates a congressional concern solely for the Hopi and Navajo tribes. The defect in the Hopi argument is that Congress was capable of naming the Hopi tribe if it wished to limit the grant solely to the Hopi and Navajo. The Court declines to reach this issue. This action only requires the Court to decide between the competing claims of the Navajo and Hopi. 25 U.S.C. § 640d–7. The Court holds below that the Hopi interest in the 1934 Act lands is tied to Hopi occupation, possession, or use of the lands on June 14, 1934. Inasmuch as an Indian tribe's presence within the 1934 area does not vest a proportionate undivided interest in the entire 1934 reservation, the Court need not decide whether the Hopis are the sole "other Indians" under the 1934 Act.

### E. What is the Nature and Extent of the Holdings

The granting clause of the 1934 Act withdraws land "for the benefit of the Navajo and such other Indians as may already be located thereon." The Hopi tribe argues that the words "as may already be located thereon" merely designate the recipients of the 1934 Act. The Navajo tribe argues that these words both designate the grantees and limit the interest of the grantees to parcels of land actually occupied on June 14, 1934.

Any words in a conveyance which operate to designate a conveyance are called "words of purchase" . . . . In contrast therewith, any words in a conveyance which operate to designate the extent of the interest acquired by a conveyee are called "words of limitation."

Restatement Property § 312 Intro. Note. The issue, therefore, is whether "as may already be located thereon" are words of limitation or words of purchase or both? The Court must first look to the language of the statute to resolve the question. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The plain wording of the 1934 Act is ambiguous. For example, the 1934 Act grants an equitable interest in "vacant, unreserved, and unappropriated" public lands. Vacant lands are those lands which are absolutely free, unclaimed, and unoccupied. Donley v. Van Horn, 49 Cal.App. 383, 193 P. 514, 517 (1920). Under the Navajo interpretation of the 1934 Act, Congress granted an equitable interest in these vacant lands to the Hopi only if the Hopi occupied the land. The condition nullifies the grant. If Congress wished to limit the "such other Indian" grant to land actually occupied, Congress could do so in plainer language. See Missionary Society v. Dalles, 107 U.S. 336, 339, 2 S.Ct. 672, 27 L.Ed. 545 (1882) (1848 Act confirms and establishes title to certain land occupied by missionaries, not exceeding 640 acres, on the date of enactment); cf. Tee-Hit-Ton Indians v. United States, supra, 348 U.S., at 291, 75 S.Ct. 1313 (Douglas, J., dissenting) (1884 Organic Act for Alaska states Indians shall not be disturbed in possession of lands actually in their use and occupancy). The Hopi interpretation is also troublesome. The title of the 1934 Act states "Exterior Boundaries of Navajo Reservation in Arizona." Nonetheless, the Hopi tribe claims an undivided one-half interest in most of the reservation.

The congressional record on the 1934 Act is sparse. The Senate and House reports, which largely incorporate an explanatory letter from the Secretary of the Interior,

are of little guidance. The Secretary addresses Hopi land rights in one terse sentence.

> It is of importance to observe that section 1 (p. 4, lines 12 to 14, inclusive) contains a provision safeguarding the rights of the Hopi Indians to their lands, which are centrally located within the present Navajo Reservation.

S.Rep. No. 1012, 73d Cong., 2d Sess. 2 (1934); H.R.Rep. No. 1602, 73d Cong., 2d Sess. 2 (1934). However, page 4, lines 12 to 14, merely preserves the existing status of the 1882 Hopi Reservation. *See* H.R. 8927, 73d Cong., 2d Sess. (April 3, 1934). The Congress is silent as to the meaning of the preceding "such other Indians" clause.

Apparently, only one legislative hearing was held on the boundary bill in 1932. *See A Proposed Bill to Define the Exterior Boundaries of the Navajo Reservation in Arizona: Hearing on S. 2213 Before the Senate Comm. on Indian Affairs*, 72d Cong., 2d Sess. (1932). The hearings concerned a bill proposed by the Bureau of Indian Affairs relating to Hopi-Navajo segregation.[8] *Id.* at 3. The bill not only contained the "such other Indians as may already be located thereon" clause, but also authorized the Secretary of the Interior to set apart from time to time lands within the boundary bill for the exclusive use and benefit of the Hopi. *Id.* at 4. The proposed bill made no mention of the 1882 Hopi Reservation. No senator expressed his views on the meaning of the "such other Indians as may already be located thereon" language; however, the Assistant Commissioner of Indian Affairs submitted for the record minutes of four meetings between administrators of the Indian Bureau and representatives of the Hopi villages. At these meetings, the Indian Bureau explained the "whole meaning of this bill." *Id.* at 29.

The first meeting took place on the First Mesa with members of the Tewa, Sichumovi, and Walpi villages.

> Mr. Stewart: Now we are going back to section 1 of the bill, especially that part reading that the lands in those lines are to be permanently for the benefit of the Navajos and such other Indians as may already be located thereon. Now I want you to especially bear in mind that by the "as may already be located thereon" that is put in the bill to especially protect the rights of the Hopi Indians to the lands they occupy around here and there is absolutely no chance of the Hopis' rights to these lands being disturbed.

> Now we are going on to that part reading: "*Provided further,* That the Secretary of the Interior is hereby authorized to determine and set apart from time to time for the exclusive use and benefit of the Hopi Indians, such areas within the Navajo boundary line above defined as may in his judgment be needed for the use of said Indians."

> I will explain to you that this means that at any time in the future if the Hopi Indians want a separate boundary line for themselves the Secretary of the Interior can set that aside. I want to assure you that it only contemplates a separate Hopi boundary line if the Hopi Indians themselves want it. As Mr. Radcliffe explained a little while ago, suggestions have been made to us by our own field men and white persons outside the Indian Service who are apparently friendly to the Hopis that certain lines should be adopted as their permanent boundary lines. Those lines involve this one large

---

8. Senators Hayden and Bratton originally introduced a bill to eliminate "checkerboard" control of the lands in northeastern Arizona and New Mexico between Indian and private landowners. S. 5557, 71st Cong., 3d Sess. (Jan. 5, 1931). No action was taken on this bill pending further study upon the area. *See Report of H. J. Hagerman on the Navajo Indian Reservation*, S.Doc. No. 64, 72d Cong., 1st Sess. (1932). The proposed bill of the Bureau of Indian Affairs not only eliminated checkerboard ownership of the land, but also provided a comprehensive solution to the persistent problems between the Navajos and the Hopis.

area here which covers all of these villages and the lands the Hopis have been using. . . . That area covers about 500,000 acres and in addition to that area it has been suggested that an area of about 32,000 acres be set aside for the use of Moencopi Wash Hopi Indians.

Mr. Radcliffe: The area on the Moencopi Wash is outside the Hopi reservation.

Mr. Stewart: Should the Hopi Indians decide that they want separate boundaries we propose to fence the lands that are set aside for them.

. . . . .

*Id.* at 34–35. A similar explanation was given at each subsequent meeting. *See id.* at 39 (Minutes of meeting at Second Mesa, villages of Mishongovi and Shipaulovi) ("Now I want especially for you to bear in mind that by the 'as may already be located thereon' that is put in the bill to especially protect the rights of the Hopi Indians to the lands they occupy around here and there is absolutely no chance of the Hopis' rights to these lands being disturbed"); *id.* at 54 (Minutes of meeting at Third Mesa, Oraibi village) ("We put that phrase 'and such other Indians as may already be located thereon' in the bill so as to protect especially the rights of Hopi Indians to what is called their reservation"); *id.* at 68 (Minutes of meeting at Third Mesa, villages of Hotevilla and Bacabi) ("That phrase 'and such other Indians as may already be located thereon' was especially put in this bill so as to protect the rights of the Hopi Indians in there to this so-called Hopi Reservation. In other words, to protect their rights to the land they are now using and occupying. I want to emphasize that fact, that the bill as now drawn does not in any way affect or change the present so-called Hopi Reservation"). This administrative interpretation of the boundary bill was presented to the Senate, and presumably, is consistent with the congressional understanding of the 1934 Act.

The proposed bill of the Bureau of Indian Affairs did not preserve the 1882 executive order reservation. The "as may already be located thereon" language was added to protect Hopi property rights. Commissioner of Indian Affairs Rhoads explains the addition in a letter of September 22, 1932, to M. Billingsley, a friend of the Hopi: [9]

Regarding your view that the present proposed bill does not define any particular area for the Hopis, and hence will give title to all the lands to the Navajo— including the present Hopi areas— . . . there is enclosed our revised copy of the bill . . . .

Your particular attention is invited . . [to these lines] reading as follows:

Are thereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon.

It will be readily seen that this language will fully protect the rights and interests of the Hopi Indians within the area covered by the proposed bill until such time as the Hopi Indians themselves agree to some definite boundary, which we hope will be somewhat along the lines indicated on the enclosed blue prints.

*See also* Letter from C. J. Rhoads to Otto Lomavitu (Sept. 24, 1932) (change was made to fully protect rights and interests of Hopi Indians within the area).[10] The new clause did not quiet the controversy, however. After the 1932 congressional hearing, the Bureau eliminated all reference to a segregated area for the Hopi Indians and added a proviso that the bill would not affect the status of the 1882 Hopi Reservation. Letter from Ray Wilbur to M. Billingsley (Jan. 5, 1933); *Letter from Henry Scattergood to Edgar Miller (Jan. 14, 1933).*[11]

After Senator Hayden introduced an amended Navajo boundary bill in February

**9.** The letter is reproduced at Navajo Ex. 94.

**10.** The letter is reproduced at Navajo Ex. 95.

**11.** These letters are reproduced at Navajo Ex. 101 and 102.

1933, no mention was made of the Hopi-Navajo land dispute. S. 5696, 72d Cong., 2d Sess. (Feb. 28, 1933). Although no longer affecting the status of the 1882 Hopi Reservation, the new bill continued to withdraw the land "for the benefit of the Navajo and such other Indians as may already be located thereon." The only meaning this clause could plausibly be given in light of the legislative history is to protect the rights and interests of the Hopi tribe to the land they were occupying and using outside the 1882 Reservation on June 14, 1934. Inasmuch as the 1934 Act did not attempt to separate Hopi and Navajo property interests, the Hopi tribe and the Navajo tribe each received an undivided one-half interest in these lands. However, the Navajo attempt to limit Hopi rights and interests to land actually occupied by the Hopi is misplaced. The 1934 Act protects both Hopi occupancy and land use. For example, grazing land and religious shrines may fall within the scope of the land grant to the Hopi. These issues present a mixed question of law and fact, however, and the Court will not rule at this time on what types of land uses are sufficient to create a property interest under the 1934 Act. After discovery, the Court can determine which kinds of Hopi possession or use on June 14, 1934 were substantial enough to create property rights within the area set aside by the boundary bill. Therefore,

IT IS ORDERED:

1. The Navajo tribe's motion to dismiss the third claim for relief is granted.

2. The Navajo tribe's motion to dismiss the amended complaint is denied in all other respects.

3. The Hopi tribe's motion for summary judgment is denied.

4. The Navajo tribe's motion for summary judgment is granted insofar as it is consistent with this memorandum and order.

5. Counsel for the Navajo tribe will prepare a form of judgment consistent with this opinion, approved by the Hopi tribe as to form only, and lodge it with the Court within ten (10) days from the filing of this order.