Abbott **SEKAQUAPTEWA**, Chairman of the Tribe, for and on behalf of the Hopi Indian Tribe and all villages, clans, and individual members of the Hopi Tribe, Appellant-Cross-Appellee,

v.

Peter **MacDONALD**, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on behalf of the Navajo Indian Tribe and all villages, clans, and individual members of the Navajo Tribe, Appellee-Cross-Appellant.

Nos. 78–3504, 78–3505.

United States Court of Appeals, Ninth Circuit.

May 23, 1980.

■

George J. Romney, Salt Lake City, Utah (argued), John S. Boyden, Scott C. Pugsley, Boyden, Kennedy, Romney & Howard, Salt Lake City, Utah, on brief, for appellant-cross-appellee.

Terry E. Fenzl, Richard Schifter, Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., for appellee-cross-appellant; Brown & Bain, Phoenix, Ariz., on brief.

Before ANDERSON and SKOPIL, Circuit Judges, and BONSAL,* District Judge.

SKOPIL, Circuit Judge:

These are interlocutory cross-appeals from a partial summary judgment in a quiet title action. The action was brought to determine the respective property interests of the Navajo and Hopi tribes in the reservation withdrawn by the act of June 14, 1934, 48 Stat. 960 (hereafter "the 1934 Act"). We are also asked to decide whether the district court had jurisdiction over the Hopi claim for an accounting for all Navajo activities on land in which the Hopi Tribe has an interest. We affirm in part and reverse in part.

The Hopis have inhabited the area in controversy "[a]s far back as the Middle

* The Honorable DUDLEY B. BONSAL, Senior United States District Judge for the Southern District of New York, sitting by designation.

Ages." *Healing v. Jones*, 210 F.Supp. 125, 134 (D.Ariz.1962), aff'd, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). The Navajos probably entered the area in the last half of the eighteenth century. *Id.* By treaty in 1868 the United States granted the Navajos an extensive reservation in the northeast corner of Arizona. 15 Stat. 667. The reservation was gradually expanded by a series of executive orders beginning in 1880 and continuing to 1918. An 1882 executive order withdrew a reservation (hereafter "the 1882 reservation") for the Hopis "and such other Indians as the Secretary of the Interior may see fit to settle thereon". Title to this reservation, on which the Navajos and Hopis are intermingled, has been extensively litigated in a separate line of cases.[1]

Neither the 1868 treaty reservation nor the 1882 reservation is at issue here. The lands at issue are those withdrawn by other executive orders from 1880 to 1918. These lands became known as the Navajo reservation. Hereafter we refer to this area as "the Reservation". They surround the 1882 executive order reservation.[2]

A 1934 Act of Congress, 48 Stat. 960, defined the exterior boundaries of the Reservation. The Act provided, *inter alia*:

All vacant, unreserved, and unappropriated public lands, including all temporary withdrawals of public lands in Arizona heretofore made for Indian purposes by Executive order or otherwise within the boundaries defined by this Act, are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon; however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive order of December 16, 1882.

In 1974 Congress authorized both tribes to sue "for the purpose of determining the rights and interests of the tribes in and to [the lands covered by the 1934 Act] and quieting title thereto in the tribes". 25 U.S.C. § 640d–7 (hereafter "the 1974 jurisdictional act").

## I—PROCEEDINGS BELOW

The Hopis filed this action. Their amended complaint requests: (1) a declaration that the Hopis have an undivided one-half interest in the lands at issue; (2) that jointly held lands be partitioned; and (3) that the court order an accounting for all Navajo activities on all land in which the Hopis have an interest.

The district court limited the proceedings to a determination of the nature of the title conferred in the 1934 Act. Following discovery the parties filed cross motions for summary judgment. In a thorough opinion the district court held that it had jurisdiction of the first two claims but not of the accounting claim. It declared that the Hopi Tribe has an undivided one-half interest in all land it "possessed, occupied or used" in 1934. It declared further that the Navajo Tribe has (1) an undivided one-half interest in all reservation land "possessed, occupied or used" by the Hopis in 1934; and (2) exclusive trust title to the rest of the reservation. The district court took no action on the claim for partition, pending final resolution of title. It also did not identify specific lands "possessed, occupied or used" by the Hopis in 1934. We granted leave to appeal under 28 U.S.C. § 1292(b).

## II—DISCUSSION

We must first address the broad question of what rights were conferred by the 1934 Act. Two subordinate issues must be settled to resolve the broader question:

---

1. *See Healing v. Jones*, 174 F.Supp. 211 (D.Ariz.1959); *Healing v. Jones, supra*, 210 F.Supp. 125; *Hamilton v. Nakai*, 453 F.2d 152 (9th Cir. 1972), *cert. denied* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972); *Hamilton v. MacDonald*, 503 F.2d 1138 (9th Cir. 1974); *Se-*

*kaquaptewa v. MacDonald*, 544 F.2d 396 (9th Cir. 1976); *Sekaquaptewa v. MacDonald*, 575 F.2d 239 (9th Cir. 1978).

2. This land was involved in *Sekaquaptewa v. MacDonald*, 591 F.2d 1289 (9th Cir. 1979).

(1) What parts of the Reservation were "vacant, unreserved, and unappropriated Public lands, including all temporary withdrawals of public lands in Arizona heretofore made by executive order"?

(2) What property interests are conferred by the phrase "for the benefit of the Navajo and such other Indians as may already be located thereon"?

Next, we must determine whether the 1974 jurisdictional act confers jurisdiction of the Hopi Tribe's claim for accounting.

## A. What Rights are Conferred by the 1934 Act?

■ 1. What lands are included in the phrase, "all vacant unreserved, and unappropriated . . . lands, including all temporary withdrawals?" Does the 1934 Act apply to all prior executive order withdrawals or only some of them?

The Navajos contend first that "including" means that "temporary withdrawals" are a subclass (or example) of "vacant, unreserved, and unappropriated" lands. The district court held that "including"; meant "and". In the district court's view the 1934 Act withdrew: (a) vacant . . . lands, and (b) temporary withdrawals.

We agree with the district court. The primary purpose of the 1934 Act was to consolidate land ownership within the boundaries of the Reservation. Prior to 1934 neither tribe had recognized (compensable) title to areas withdrawn by executive order. To effectuate consolidated land ownership, the 1934 Act should be read to confirm land title to the greatest possible amount of land. The district court's conclusion is consistent with this.

The Navajos' suggestion that title was conferred only to "vacant" lands would have anomalous results. The district court's holding makes Hopi title hinge on possession, occupancy, or use. Hopi possession would preclude a finding of vacancy.

The Hopis would have no title. Navajo title would be limited to lands vacant in 1934. We therefore reject this suggestion.

The Hopis contended that "temporary withdrawals" include all executive order withdrawals except the 1882 reservation exempted by the 1934 Act. The district court agreed, equating "temporary withdrawals" with executive order withdrawals. Its conclusion was based on the 1934 Act's purpose to consolidate reservation land ownership. It was necessary to confirm title in all executive order withdrawals since such withdrawals in themselves confer no recognized or compensable title. See U. S. v. So. Pac. Transp. Co., 543 F.2d 676 (9th Cir. 1976).

The Navajos argue that "temporary" has acquired special meaning in United States Attorney General and Interior Department opinions which were based on dicta in a Supreme Court case, U. S. v. Midwest Oil, 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1914). In the Navajos' view, executive order withdrawals made to preserve a status quo until Congress can act are "temporary", and executive order withdrawals made for public purposes where no legislative action is contemplated are "permanent".[3]

The district court rejected this suggestion firmly. Its reasoning is persuasive. The overriding purpose of the 1934 Act repudiates the Navajos' interpretation. To consolidate reservation ownership it was necessary to change the status of reservation land title from a "tenancy at will to a permanent compensable interest". The proposed distinctions were developed by agency officials to justify executive withdrawals that would otherwise have conflicted with legislation. There is no reason to think that Congress approved this device or adopted this usage. If Congress had intended such a technical usage it might have said so clearly.

**3.** This distinction was approved by this court in *U. S. v. Consolidated Mines & Smelting Co., Ltd.*, 455 F.2d 432, 445 (9th Cir. 1971), but in reference to an executive order withdrawal.

That case sheds no light on whether such a usage should be attributed to Congress, which is the question here.

Finally, it is argued that "temporary withdrawals" must be construed not to apply to withdrawals made expressly for Navajos. The Navajos maintain that once lands are reserved for Indians, any subsequent grant purporting to affect those lands must be strictly construed. *Leavenworth, etc., R.R. Co. v. U. S.*, 92 U.S. 733, 746, 23 L.Ed. 634 (1876); *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). The cited cases all involved assertions that Congress had withdrawn land from Indian reservation status, hence its status as "Indian country". See 18 U.S.C. § 1151. Among other things such a result would have terminated federal and tribal jurisdiction, both civil and criminal. 18 U.S.C. § 1151; *DeCoteau v. District County Court*, 420 U.S. 425, 427 n.2, 95 S.Ct. 1082, 1084 n.2, 43 L.Ed.2d 300 (1975). In view of these drastic results, a congressional intention to terminate is not to be inferred unless it is "expressed on the face of the Act or . . . clear from the surrounding circumstances and legislative history." *Mattz v. Arnett, supra,* 412 U.S. at 505, 93 S.Ct. at 2258.

No intent to terminate need be shown here because there has been no termination. No one contends that the 1934 Act withdrew the Reservation from Indian country. The federal government's jurisdiction and trust obligations remain intact. *See, e. g.,* 25 U.S.C. § 631 *et seq.* Far from terminating prior executive order reservations, the 1934 Act reinforces them by recognizing and confirming Indian title.

Assuming an executive order could create an exclusive right of occupancy in one tribe versus another, it is important "to have in mind the circumstances in which the reservation was created". *Alaska Pacific Fisheries v. U. S.*, 248 U.S. 78, 87, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918). *See also U. S. v. Walker River Irr. Dist.*, 104 F.2d 334, 336 (9th Cir. 1939). Where two tribes have intermingled in the pattern shown here, we cannot blandly assume the executive has divested the indigenous tribe. The Navajos do not convincingly show that such was the executive's intent.

■ The Navajos next contend that the 1900 executive order withdrawal was ratified by a 1902 appropriations act, thereby recognizing Navajo title. A strict standard applies in determining whether legislation transfers or recognizes compensable title. *Tee-Hit-Ton Indians v. U. S.*, 348 U.S. 272, 278–79, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955) ("[T]here must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation"); *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 105, 69 S.Ct. 968, 980, 93 L.Ed. 1231 (1949) ("It would take specific and unambiguous legislation to cause us to rule that Congress intended to authorize the Secretary of the Interior to alienate . . . fisheries permanently").

The 1902 appropriations act makes no direct or indirect mention of title. The Navajos do not point to convincing legislative history to support their position.[4] We reject the Navajo argument. *See Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 655–56, 96 S.Ct. 1793, 1796–97, 48 L.Ed.2d 274 (1976).

We conclude that the 1934 Act applies to all prior executive order withdrawals.

■ 2. What property interests are conferred by the phrase "for the benefit of the Navajo and such other Indians as may already be located thereon"?

The Hopis contend that this provision vests undivided, one-half interests in both tribes. In their view, "as may already be located thereon" is merely a way of identifying the Hopis. It does not limit Hopi rights to land occupied. In real estate conveyancing parlance, they are "words of purchase".

The district court held that this language limits Hopi rights to lands "possessed, occupied or used" in 1934. The words "as may

---

**4.** The Navajo position is based on evidence that President McKinley felt that it would be unjust to take the 1900 executive order lands without compensation. This says little of legislative intent to recognize exclusive Navajo title.

already be located thereon" are words of limitation. Under the district court's holding, the Navajos have: (1) an undivided one-half interest in lands occupied by the Hopis in 1934, and (2) exclusive trust title in all other reservation lands.

The 1934 Act is concerned primarily with Navajo affairs. The boundaries described are of "the Navajo Indian Reservation". The Act provides for the purchase of additional Navajo lands with Navajo funds. Navajos are precluded from receiving royalties from water developments on lands added to the Navajo reservation. Further allotments to Navajos are restricted. The Secretary is authorized to acquire private land for the Navajos. The State of Arizona is authorized to exchange school sections "within the boundary of the Navajo Reservation . . . in favor of said Indians". Funds are authorized to purchase the State's improvements on school sections if the State assigns its interest in the sections to the Navajos.

The only mention of the Hopis in the 1934 Act is in the provision excepting the 1882 reservation from the Act's effects. The Hopis' argument that the "plain meaning" of the 1934 Act vests equal title in both tribes is tenuous at best. They stress the word "all" in "All . . . lands . . are . . . withdrawn . . . for the benefit of the Navajo and such other Indians as may already be located thereon." However, one must resort to extrinsic sources even to conclude that "such other Indians" includes the Hopis. The word "all" could be read to create undivided one-half interests in both tribes, but it does not do so unambiguously. Legislative history makes it plain that "located thereon" cannot be read to convey to the Hopis a one-half interest in the Reservation. The district court's holding was based on a fair reading of the 1934 Act's legislative history. See 448 F.Supp. 1193–1196.

The Hopis suggest that real property conveyancing presumptions require that this language be construed to create a tenancy in common. Policies underlying conveyancing presumptions have no necessary application to federal-Indian relations.[5] The intent of Congress, which we read to conflict with the conveyancing presumptions, governs. We therefore reject this suggestion.

The Hopis also suggest this result is inconsistent with *Healing v. Jones, supra,* 210 F.Supp. 125. In *Healing* a 1958 statute withdrew the lands described in the 1882 executive order. The 1958 statute withdrew lands "for the Hopi Indians and such other Indians, if any, as heretofore have been settled thereon by the Secretary of the Interior pursuant to such Executive order". The 1882 executive order used similar words: "for the use and occupancy of the Moqui (Hopi), and such other Indians as the Secretary of the Interior may see fit to settle thereon." The *Healing* court held that the 1882 order created a Hopi right of occupancy to the entire area, regardless of where they settled. The Navajos subsequently acquired an equal right to occupy lands on which they were administratively settled. In areas where there was no Navajo settlement, the 1958 Act confirmed exclusive Hopi trust title.

The Hopis contend that the district court's ruling here is in effect the same as the ruling in *Healing:* the named tribe receives an interest in all lands, while the "other Indians" have a one-half interest in land occupied. Yet the statute and order in *Healing* are different from the 1934 Act at issue here. In *Healing* "other Indians'" rights were contingent on administrative action. In this case no such action was required. The 1934 Act immediately vested

---

5. In *U. S. v. Washington,* 520 F.2d 676, 685 (9th Cir.) *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), *aff'g,* 384 F.Supp. 312 (W.D.Wash.1974), this court drew by analogy on cotenancy principles to adjust competing Indian and non-Indian claims to fisheries. However, this was only after the rights to the fisheries were determined pursuant to principles of treaty interpretation. The cotenancy analogy was used in aid of partition, after trial was determined.

If we were to apply real property principles to this case, the more accurate analogy might be to a class gift. *See Restatement of Property,* § 300 (and see Comment f), and § 367, Comment e (1940 ed.).

rights in both tribes. Therefore, the Hopis argue, equivalent results in the two cases must be error.

Even if the district court's holding were inconsistent with *Healing,* legislative intent behind the 1934 Act must control. But there is no inconsistency. The statute and order in *Healing* used different language in a different legislative setting than the 1934 Act. The fact that the two cases arrived at superficially similar results should not in itself give pause. The single factor present in *Healing* and not here was the initial withdrawal of all land in favor of the named tribe. In *Healing* the "other Indians" obtained an interest in reservation lands only after obtaining secretarial authorization to settle. The Hopis seem to suggest that this *Healing* method is the only way for Congress to authorize the result the district court reached. Congressional power over Indian land is broad. *Warren Trading Post v. State Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *U. S. v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913). We cannot restrict Congress in the way the Hopis suggest. Congressional intent is inconsistent with the Hopis' claim to entitlement to a one-half interest in the reservation. We must respect that intent.

Finally, the Hopis argue that the issue of title is a political question. Congress did not identify Navajo-Hopi boundaries in the 1934 Act. The Hopis would not agree to boundaries proposed by the administration, and Congress was unwilling to force the issue. The Hopis lobbied to protect what they thought was theirs. This resulted in the exemption of the 1882 reservation from the 1934 Act and the "such other Indians" · language. The question is what inferences can be drawn from this. The Hopis suggest that: (1) since Congress refused to draw a Navajo-Hopi boundary, it is improper (as a political judgment) for the court to impose limitations on Hopi property interests; and therefore (2) the 1934 Act must be read as creating a cotenancy. The Navajos suggest that Congress specifically limited Hopi rights by the "such other Indians as may already be located thereon" provision.

Whether the title question is political depends on whether there is "a lack of judicially discoverable and manageable standards for resolving it"; or whether the question is impossible to decide "without an initial policy determination of a kind clearly for nonjudicial discretion". *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). *See also Healing v. Jones, supra,* 174 F.Supp. at 216 ("[I]f the identification of the holders of such title and extent and nature of the respective rights and interests of each cannot be fixed without exercising, or reviewing the exercise of, political judgment, then the judicial power is not constitutionally invoked.").

If we agreed that there were insufficient standards to determine title, it does not follow, as the Hopis maintain, that we must declare the tribes cotenants. It would be more logical for us to dismiss the case for lack of jurisdiction of the political question.

We do not agree, however, that there are no judicially ascertainable standards governing this question. We acknowledge the absence of a Navajo-Hopi boundary, as we must. We do not concede that the question of Navajo and Hopi property interests was left open. It is a mistake to assume that the absence of a boundary negates standards for determining title. The purposes, history, and language of the 1934 Act show an intent to withdraw all reservation land for the Navajos except for pockets occupied by Hopis. We agree with the district court that this is the meaning of the "such other Indians as may already be located thereon" provision. The legislative history discussed by the district court at 448 F.Supp. 1194–96, supports this conclusion.

Congress was not inflexibly committed to the notion of exclusive areas for the two tribes. It preferred to allow the tribes to work out whatever cooperative arrangement they could. But when negotiations failed, the 1974 jurisdictional act authorized the courts to declare boundaries if one of the tribes so requested. Since its jurisdiction was invoked for this purpose, the district court properly looked to the legislative history of the 1934 Act to determine the tribes' interests.

To be sure, Congress did not specify in metes and bounds the extent of tribal property interests in the withdrawn property. Nevertheless, legislative intent is clear enough to enable us to identify Hopi interests by areas settled. Navajo interests are identifiable as the residue. Congress recognized Hopi concern over the 1882 reservation and their villages, shrines, and grazing areas outside the 1882 reservation. The "such other Indians" provision was explained to the Hopis as protecting their rights to areas occupied outside the 1882 reservation. There is no indication that anyone contemplated joint title to the entire area involved here. In this context the Hopis' assertion of joint title must be rejected.

The district court held that the Hopis' interest in land they were occupying in 1934 was limited to an undivided one-half interest. In effect the district court held that because the 1934 Act did not establish boundaries for exclusive Hopi lands, each tribe must have an undivided one-half interest. We have rejected this approach in determining the question of title. We must draw on legislative history to find standards for determining title.

Looking to legislative history, a stronger case can be made that Hopi interests are exclusive rather than joint. The Act was not intended to disturb then-existing land tenure patterns. Hopi villagers were told the Act would "protect the rights of the Hopi Indians to the lands they occupy around here and there is absolutely no chance of the Hopis' rights to these lands being disturbed." Ex.H. 143, at 766. It is true that the phrase "the Hopis' rights to these lands" is ambiguous. Technically speaking, neither the Hopis nor the Navajos could have had any clear idea what those rights might be. But in their natural and untechnical sense these words are not ambiguous. They say rather clearly that the 1934 Act would not disturb the Hopis' right to occupy the land they were then occupying. This is consistent with the intent of the 1934 Act to preserve a *status quo* and not to disturb existing arrangements. We therefore reverse the judgment insofar as it limits Hopi interests to an undivided one-half interest in lands they exclusively possessed, occupied, or used in 1934. Judgment should be entered declaring Hopi interests in those lands to be exclusive.

### B. Does the Court Have Jurisdiction of the Hopi Claim For An Accounting?

■ The Hopis claim that jurisdiction of the claim for an accounting is conferred expressly and impliedly by the 1974 jurisdictional act. They contend that express authority is provided by 25 U.S.C. § 640d–17(c):

> Either tribe may institute such further original, ancillary, or supplementary actions against the other tribe as may be necessary or desirable to insure the quiet and peaceful enjoyment of the reservation lands . . ., and to fully accomplish all objects and purposes of sections 640d to 640d–24 of this title.

They also contend that an accounting is an integral aspect of an action for partition. Therefore 25 U.S.C. § 640d–7(b), authorizing partition of jointly held lands, impliedly authorizes an accounting.

■ The district court rejected these contentions. See 448 F.Supp. 1183. Its conclusion was correct. Federal courts' jurisdiction being limited, the burden was on the Hopis to establish jurisdiction. The United States and Indian tribes such as the Navajos possess coextensive sovereign immunity. Tribes may be sued only with the consent of Congress. *Hamilton v. Nakai*, 453 F.2d 152, 158 (9th Cir. 1972). When Congress consents to suit, it may impose limitations. Limitations must be "strictly observed and exceptions thereto are not to be implied". *Id.* at 159 (quoting from *Soriano v. U. S.*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). Therefore the Hopis have a heavy burden to establish jurisdiction.[6]

---

**6.** The Hopis' characterization of the 1974 jurisdictional act as "remedial legislation" is unconvincing. The 1974 Act was intended to settle a title controversy between two quasi-sovereign

Section 640d–17(c) does not mention claims for accounting. There is therefore no express grant of jurisdiction of accounting claims in section 640d–17(c).

Nor do we see a sound basis for an implied jurisdictional grant. The 1974 jurisdictional act provides different procedures and remedies for the 1882 executive order reservation and for the surrounding reservation confirmed by the 1934 Act. The 1974 Act specifically provides for accountings and damages claims for lands within the 1882 reservation. 25 U.S.C. § 640d–17(a). The absence of similar provisions for the 1934 Act's lands is telling.[7] The district court gave a likely explanation for the omission. Without a prior adjudication of title, Congress could not know what kind of financial burden an accounting would impose and on which tribe. If the Hopis were entitled to one-half of the Navajo reservation, for instance, an accounting might break the Navajo bank. It is therefore likely that. Congress purposefully did not authorize an accounting claim. We cannot infer one.

The Hopis contend that the legislative history of the 1974 jurisdictional act shows that an accounting was intended. We disagree. The legislative history shows only a desire for a final settlement of all title claims. This history might support an inference that an accounting was intended. But any inference is weak at best and cannot sustain the Hopi burden of establishing jurisdiction.

Similarly unconvincing is the Hopi contention that an accounting is merely an inherent aspect of judicial partition. The authorities they cite support such a position, but only with respect to private adjudications. None involve Indian tribes possessing attributes of sovereignty. None involve a federal statute establishing detailed processes and standards for quieting title, partition, and accountings in limited circumstances. We must strictly observe the limitations Congress has established.

The 1974 jurisdictional act, 25 U.S.C. § 640d–7, authorizes actions to quiet title and to partition lands in some circumstances. Section 640d–17(c) authorizes "further original, ancillary or supplementary actions" only if they insure "the quiet and peaceful enjoyment of the reservation lands" or to accomplish the "objects" of the Act. It is not at all clear that an action for accounting would insure quiet and peaceful enjoyment of reservation lands. The effect might be the opposite. The "objects" of the 1974 jurisdictional act with respect to the 1934 Act lands are spelled out in section 640d–7. Those objects are to quiet title and to partition certain lands. An action for accounting serves neither purpose.

### III—CONCLUSION

We remand to the district court to determine what land the Hopis "possessed, occupied, or used" in 1934. In doing so, we acknowledge the possibility that some reservation land, grazing land for instance, may have been used by both tribes in 1934. Even in villages it may not be possible for the court to conclude that the Hopis "possessed, occupied, or used" such land exclusively. In that event it may be proper on remand for the district court to declare title to be joint or undivided, subject to partition. We reverse only with respect to the

Indian tribes. The Act does not create a private remedy for wrongs. Compare *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (private remedy under securities acts).

7. The Hopis offer an obscure explanation for this omission. They contend that an accounting and damages are authorized for the 1882 reservation lands because title to those lands had already been adjudicated (in *Healing v. Jones, supra,* 210 F.Supp. 125) when Congress passed the 1974 jurisdictional act. It was

therefore possible for Congress to spell out the details of the final settlement of the 1882 title claims. In contrast, title to the 1934 Act reservation is still uncertain. Congress could not spell out the "details" of a final settlement because of this uncertainty.

This argument is strained. There is no convincing reason to believe that uncertainty over title caused Congress to provide for an accounting only impliedly. The same uncertainty did not prevent Congress from specifically allowing for partition.

district court's holding that Hopi title is necessarily non-exclusive, even with respect to land that was actually and exclusively "possessed, occupied, or used" in 1934.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.