# United States Court of Appeals for the Federal Circuit

---

**THE NAVAJO NATION,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-5036

---

Appeal from the United States Court of Federal Claims in case no. 88-CV-508, Senior Judge Eric G. Bruggink.

---

Decided: January 10, 2011

---

DALE S. ZEITLIN, Zeitlin & Zeitlin PC, of Phoenix, Arizona, argued for plaintiff-appellant.

MARY GABRIELLE SPRAGUE, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, for defendant-appellee. With her on the brief were IGNACIA S. MORENO, Assistant Attorney General, and ELIZABETH ANN PETERSON, Attorney.

---

Before DYK, MAYER, and MOORE, *Circuit Judges*.

MAYER, *Circuit Judge*.

The Navajo Nation appeals a judgment of the United States Court of Federal Claims denying its claim seeking damages for an alleged Fifth Amendment taking of its right to develop land granted to it by the United States in 1934. *See Navajo Nation v. United States*, No. 88-CV-508 (Fed. Cl. July 13, 2009). Because we conclude that the claim is barred by the six-year statute of limitations set out in 28 U.S.C. § 2501, we vacate the judgment of the Court of Federal Claims and remand with instructions to dismiss for lack of jurisdiction.

## BACKGROUND

The present dispute follows in the wake of a long-running controversy between the Hopi Tribe and the Navajo Nation over vast swaths of land in northeastern Arizona. For decades, the two tribes sought to establish their respective rights to land within two reservations, the 1882 Reservation, which consists of approximately 2.5 million acres, and the 1934 Reservation, which consists of approximately 8.2 million acres. The 1882 Reservation is surrounded by the 1934 Reservation.

On December 16, 1882, President Chester A. Arthur established the 1882 Reservation for the benefit of the Hopi "and such other Indians as the Secretary of the Interior may see fit to settle thereon." Exec. Order of Dec. 16, 1882, *reprinted in Healing v. Jones*, 210 F. Supp. 125, 129 n.1 (D. Ariz. 1962), *aff'd*, 373 U.S. 758 (1963). In 1934, Congress delineated the exterior boundaries of a Navajo Reservation and permanently withdrew all unreserved and non-appropriated public lands within those boundaries "for the benefit of the Navajo and such other Indians as may already be located thereon." Act of June

14, 1934, 48 Stat. 960, 961 (the "1934 Act"). At the time of the 1934 Act, members of the Hopi Tribe were living on portions of the 1934 Reservation.

In 1962, a district court concluded that approximately 650,000 acres of the 1882 Reservation belonged exclusively to the Hopi Tribe, and that the Hopi Tribe and the Navajo Nation had joint and undivided interests in the remaining land. *See Healing*, 210 F. Supp. at 191-92. While the *Healing* litigation was pending, members of the Hopi Tribe asked the Department of the Interior ("DOI") to take action to protect their rights within the 1934 Reservation. In response, DOI Commissioner of Indian Affairs Robert Bennett concluded that "the Government can no longer continue to administer the [portion of the 1934 Reservation located directly to the west of the 1882 Reservation] as though it were owned solely by the Navajo Tribe." He determined that "[n]o action shall be taken by an official of the [DOI] that does not take full cognizance of the undetermined rights and interests of the Hopi Indians" in the affected area. He therefore imposed a "mutual consent" requirement, which mandated that the Hopi and the Navajo obtain the consent of the other tribe before undertaking development projects in the region. The region affected by Bennett's mutual consent requirement became known as the "Bennett Freeze" area. *See Masayesva v. Zah*, 816 F. Supp. 1387, 1415 (D. Ariz. 1992) (explaining that "[t]he Bennett Freeze was intended to protect the interests of the Hopi Tribe pending any negotiated, congressional, or court resolution of Hopi and Navajo property interests in the 1934 Reservation").

In 1967, Bennett determined that public works projects would not be subject to mutual consent requirements. In 1970, however, this decision was reversed and public works projects were again made subject to such requirements. In 1972, development within Moenkopi

and Tuba City was exempted from the mutual consent requirements. The mutual consent requirements were again modified in 1976 when DOI Commissioner Morris Thompson allowed an appeal to him of any Navajo project "for which the Hopi Tribe has specifically refused to grant its consent" or for which it refused "to consider granting its consent within 30 days after being requested to do so." The stated purpose for this modification was to lessen any "arbitrarily imposed obstacle to meeting Navajo needs."

In 1974, Congress enacted legislation designed to resolve the conflicting claims of the Navajo Nation and the Hopi Tribe to land within the 1934 Reservation. *See* 25 U.S.C. § 640d *et seq.* (1974) (the "1974 Settlement Act"). The 1974 Settlement Act gave the tribes the right to bring suit against each other for the purpose of determining their respective property rights in the 1934 Reservation. 25 U.S.C. § 640d-7; *see Sekaquaptewa v. MacDonald*, 619 F.2d 801, 809-10 (9th Cir. 1980).

On July 8, 1980, Congress amended the 1974 Settlement Act. *See* Pub. L. No. 96-305, 94 Stat. 929 (codified at 25 U.S.C. § 640d-9(f) (1980)) (the "1980 Amendment"). The 1980 Amendment codified the requirement, first imposed by DOI Commissioner Bennett, that the Navajo and Hopi obtain the consent of the other tribe before undertaking development projects within the Bennett Freeze area:

> Any development of lands in litigation pursuant to section 8 of this Act and further defined as "that portion of the Navajo Reservation lying west of the Executive Order Reservation of 1882 and bounded on the north and south by westerly extensions, to the reservation line, of the northern and southern boundaries of said Executive Order Reservation," shall be carried out only upon the

> written consent of each tribe except for the limited areas around the village of Moenkopi and around Tuba City. Each such area has been heretofore designated by the Secretary. "Development" as used herein shall mean any new construction or improvement to the property and further includes public work[s] projects, power and water lines, public agency improvements, and associated rights-of-way.

25 U.S.C. § 640d-9(f) (1980).

The purpose of the 1980 Amendment was "to preserve the parties' rights subject to a final adjudication" of the tribes' respective interests in the affected area. *Masayesva*, 816 F. Supp. at 1397. The amendment did not grant either tribe the right to appeal to the DOI if its request for consent to a development project was denied. Following the enactment of the 1980 Amendment, the Hopi approved a few Navajo development projects within the Bennett Freeze area. On August 26, 1982, however, the Hopi imposed a moratorium on all further Navajo construction activities:

> The Hopi Negotiating Committee . . . unanimously voted to place a moratorium on any and all construction activities, more specifically within the Bennett Freeze Order Area (BFOA), until certain issues have been addressed satisfactorily surrounding current and potential construction activities in the litigated BFOA and the entire 1934 Reservation.

In 1988, Congress again amended the 1974 Settlement Act and authorized a procedure under which the tribes could appeal denials of consent for construction projects to the DOI. *See* Navajo and Hopi Indian Relocation Amendments Act of 1988, Pub. L. No. 100-666, § 6,

102 Stat. 3929, 3932. Pursuant to this provision, the DOI was authorized to approve development projects to the extent it determined that such projects were "necessary for . . . health or safety." *Id.*

On August 25, 1988, the Navajo Nation filed suit in the Court of Federal Claims. It argued that the mutual consent requirement "constitute[d] a continuing taking of [its] property without just compensation and violate[d] the trust responsibility owed by [the United States] to the [Navajo Nation] as an Indian Tribe and to the [Navajo Nation's] members as Native Americans." The complaint further alleged that since the time of the 1980 Amendment "[v]irtually no development has been approved by the Hopi Tribe, which has opposed even repairs to existing structures."

Discovery was conducted from 1990 to 1993. On March 8, 1996, the Court of Federal Claims concluded that there were genuine issues of material fact regarding the Navajo Nation's breach of trust and takings claims and therefore denied the government's motion for summary judgment on those claims. The case was then held in abeyance until ongoing district court litigation concerning the tribes' respective rights to land within the 1934 Reservation was concluded. In March 1997, the United States District Court for the District of Arizona issued an order approving a partial settlement agreement between the Hopi Tribe and Navajo Nation over Bennett Freeze area property. *See Secakuku v. Hale*, No. 74-842-PCT-EHC (D. Ariz. Mar. 31, 1997). It was not until December 4, 2006, however, that the district court lifted the statutory freeze in its entirety and approved a final settlement resolving the land dispute between the tribes. *See Honyoama v. Shirley*, No. 74-842-PHX-EHC (D. Ariz. Dec. 4, 2006).

On February 27, 2009, the Court of Federal Claims granted the United States' motion for summary judgment on the Navajo Nation's breach of trust claim. It concluded that the Navajo Nation had failed to identify "a money-mandating fiduciary duty" on the part of the government sufficient to support an action for money damages with respect to that claim. In addition, the trial court concluded that the 1934 Act did not vest the Navajo Nation with the exclusive right to control land within the Bennett Freeze area:

> There is . . . an irreconcilable conflict between the rights [the Navajo Nation] claims it had from the inception of the 1934 Act and the rights Congress gave the tribe. Inherent in [the Navajo Nation's] claim is the assertion that it had the right to exclusive control to develop in the [Bennett Freeze area] without Hopi interference, as well as the right to compensation for any such interference. . . . Congress made clear through legislation implemented decades after the 1934 Act that [the Navajo Nation] did not—and never did have—exclusive control of the land in question.

The Court of Federal Claims determined that the Navajo Nation's "right to operate unilaterally on particular [Bennett Freeze area] lands (i.e., unencumbered by restrictions originating in Hopi claims) was not part of [the Navajo Nation's] property interest until the conclusion of the district court litigation in 2006." Because it concluded that the Navajo Nation did not have the requisite property interest to establish a valid takings action, the trial court dismissed the complaint.[1]

---

[1] The trial court stated: "The government's last affirmative act was Congress' enactment of the 1980 Amendment, which confirmed the Hopi's rights to oppose

The Navajo Nation timely appealed to this court. This court reviews final judgments of the United States Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3). Whether the Court of Federal Claims possesses jurisdiction over a claim is a question of law subject to *de novo* review. *Western Co. v. United States*, 323 F.3d 1024, 1029 (Fed. Cir. 2003).

## DISCUSSION

Pursuant to the Fifth Amendment, the government is prohibited from taking private property for public use without just compensation. U.S. Const. amend. V. "A compensable taking can occur not only through the government's physical invasion or appropriation of private property, but also by government regulations that unduly burden private property interests." *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 (Fed. Cir. 2008) (citations omitted).

The Navajo Nation contends that it suffered a Fifth Amendment taking of the right to develop the land granted to it by the United States pursuant to the 1934 Act. It argues that the Act vested it with a compensable property interest in the entire 1934 Reservation, with the exception of small pockets of land which were occupied in 1934 by members of the Hopi Tribe, and "that the United States temporarily took its land by imposing a develop-

---

Navajo development projects. . . . [I]f the last relevant action of the United States occurred in 1980, then the action would appear to be filed too late, unless there is some reason to delay the accrual of the cause of action until at least 1982." The court did not grant the government's motion to dismiss the Navajo Nation's complaint as untimely, however, but instead dismissed on the ground that the Nation had failed to establish that it had the requisite property interest in the 1934 Reservation to establish a valid takings claim.

ment moratorium (including acquiescing in the Hopi moratorium)" on the property contained within the Bennett Freeze area.[2]  The Nation asserts that its takings claim accrued in August 1982, when the Hopi Tribe refused to grant the Navajo permission to engage in any development projects within the affected region or, in the alternative, in 2006, when the district court litigation resolving the tribes' respective property rights in the 1934 Reservation concluded.

In response, the government contends that the 1934 Act did not grant the Navajo Nation the right to exclusive control of property within the 1934 Reservation.  Instead, according to the government, the 1934 Act gave an interest in the 1934 Reservation to both the Navajo Nation and the Hopi Tribe, and the Nation never had the right, until the end of the 2006 district court litigation, to unilaterally develop land within the Bennett Freeze area.  The government argues, moreover, that even if the Navajo Nation had a valid takings claim, that claim is barred by the six-year statute of limitations applicable to suits brought in the Court of Federal Claims.

We agree with the government that the Navajo Nation's claim is time-barred.  "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within

---

[2]    The Navajo Nation correctly acknowledges that the 1934 Act did not grant it the exclusive right to control property within the 1934 Reservation, since its property rights were subject to the overriding authority of the United States to manage the lands.  *See Sekaquaptewa*, 619 F.2d at 805; *see also United States v. Sioux Nation*, 448 U.S. 371, 415 (1980); *Shoshone Tribe v. United States*, 299 U.S. 476, 496-97 (1937).  It argues, however, that the 1934 Act gave it the right to develop the vast majority of land within the 1934 Reservation free from any interference from the Hopi Tribe.

six years after such claim first accrues." 28 U.S.C. § 2501. This six-year limitations period is jurisdictional and may not be waived. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136-39 (2008). Even assuming *arguendo* that (1) the 1934 Act vested the Navajo Nation with the right to unilateral development within the Bennett Freeze area, and (2) the restrictions on development within that area could be construed as a compensable taking of the Nation's property rights, any Fifth Amendment takings claim is barred because it was filed more than six years after it first accrued.

In general, a takings "claim first accrues when all the events have occurred which fix the alleged liability of the [government] and entitle the plaintiff to institute an action." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (internal quotation marks omitted); *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995). "Therefore, a claim under the Fifth Amendment accrues when [the] taking action occurs." *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (citations and internal quotation marks omitted). Here, the Navajo Nation's takings claim, if any, accrued when the United States precluded it from developing land within the Bennett Freeze area without Hopi Tribe approval. This was the only governmental action that served to restrict any right the Nation may have had, pursuant to the 1934 Act, to exclusive control of property within the 1934 Reservation, and it is therefore the only action which could even arguably form the basis for a valid takings claim. *See Nw. La. Fish & Game Pres. Comm'n v. United States*, 446 F.3d 1285, 1289 (Fed. Cir. 2006) ("A taking occurs when governmental action deprives the owner of all or most of its property interest.").

In 1966, DOI Commissioner Bennett imposed a requirement that the Navajo and Hopi obtain approval from

the other tribe before undertaking development efforts within portions of the 1934 Reservation lying to the west of the 1882 Reservation.  At the time of this "administrative freeze," the Navajo Nation knew that any right it may have had to undertake unilateral development within the affected area had been significantly curtailed. When Congress enacted the 1980 Amendment, it codified the mutual consent requirement and explicitly provided that "[a]ny development of lands" in the Bennett Freeze area could "be carried out only upon the written consent" of the other tribe.[3]  25 U.S.C. § 640d-9(f) (1980).  Assuming *arguendo* that the 1934 Act vested the Navajo Nation with the right to develop land within the Bennett Freeze area unencumbered by Hopi Tribe claims, the 1980 Amendment deprived the Nation of that right and "fix[ed] the alleged liability" of the government for any takings action.  *Hopland*, 855 F.2d at 1577; *see Goodrich*, 434 F.3d at 1333.  Because the Navajo Nation did not file suit until more than eight years after enactment of the 1980 Amendment, its claim is time-barred.

Contrary to the Nation's assertions, its takings claim did not accrue when the Hopi Tribe decided, on August 26, 1982, to impose a moratorium on approval of Navajo construction projects.  A takings claim must be predicated on actions undertaken by the United States, not the Hopi Tribe.  What a plaintiff "may challenge under the Fifth Amendment is what the government has done, not what [third parties] have done." *Fallini*, 56 F.3d at 1383; *see also Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1482 (Fed. Cir. 1994) ("The language of the Fifth Amendment itself requires that the

---

[3]   Congress exempted areas near Tuba City and Moenkopi from the mutual consent requirements.  *See* 25 U.S.C. § 640d-9(f) (1980).

United States, not a [third party], commit the taking action.").

*Goodrich* is instructive on this issue. There, a Montana cattle rancher alleged that he suffered a compensable taking of water rights when the Forest Service issued a directive allowing a third party to move his cattle onto property adjacent to the rancher's land. 434 F.3d at 1333-35. We held that the rancher's claim accrued when the Forest Service issued its directive, not when the third party entered the land with his cattle several years later. *Id.* at 1334-36. Likewise, in *Fallini*, 56 F.3d at 1380-83, we held that any takings claim accrued when Congress enacted legislation which precluded landowners from excluding wild horses from drinking from the proprietary water sources they had constructed on federal lands. We explained that it was the government's "enactment of the statute, not the individual intrusions by the horses" that caused any takings claim to accrue. *Id.* at 1383; *see also Ladd v. United States*, No. 2010-5010, 2010 U.S. App. LEXIS 25443, at *21 (Fed. Cir. Dec. 14, 2010) (explaining that a takings claim accrues when the government takes action which deprives landowners of "possession of their property unencumbered by [an] easement," regardless of whether third parties ever take physical possession of that easement (footnote omitted)); *Caldwell v. United States*, 391 F.3d 1226, 1233-35 (Fed. Cir. 2004) (concluding that any taking occurred when the government took action preventing landowners' state law reversionary interests in a railroad right-of-way from vesting, not when subsequent actions by third parties caused the right-of-way to be converted to an interim trail for recreational use).

A similar analysis applies here. When Congress enacted the 1980 Amendment, it precluded the Navajo Nation from undertaking any development within the

Bennett Freeze area unless the Hopi Tribe gave written consent. This was the date of the last governmental action that served to restrict the Navajo's right to develop property within the 1934 Reservation. Although the Hopi Tribe did not decide to withhold consent for all Navajo Nation construction projects until August 1982, for purposes of determining when a takings claim accrues "it is necessary . . . to look to the nature and timing of the *governmental action* that constituted the alleged taking." *Fallini*, 56 F.3d at 1383 (emphasis added); *see also Alliance of Descendants of Tex. Land Grants*, 37 F.3d at 1482.[4]

On appeal, the Navajo Nation advances three arguments in support of its contention that its complaint was timely filed. First, it asserts that its claim did not accrue until August 1982 because the Hopi Tribe was acting as an agent of the United States when it imposed a moratorium on all further development within the Bennett Freeze area. Second, the Nation contends that the statute of limitations did not begin to run when the 1980 Amendment was enacted because its takings claim was not "known and stabilized" at that time. Finally, it argues that its cause of action did not accrue until December 2006, when a district court entered final judgment resolving the respective rights of the tribes to land within the 1934 Reservation. We address each of these arguments in turn.

---

[4]    We do not reach the issues of whether the 1934 Act vested the Navajo Nation with the right to exclusive control of property within the Bennett Freeze area or whether the government's directive that no development in the area could take place without Hopi Tribe consent constituted a compensable taking of those property rights. We hold only that any takings claim is barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501.

I.

The Navajo Nation contends that the Hopi Tribe was acting as an agent of the United States when it imposed a moratorium on Navajo construction activities, and that the moratorium can therefore be attributed to the United States for purposes of determining when its cause of action accrued. We disagree. "[A]n agency relationship results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1360 (Fed. Cir. 2002) (citations and internal quotation marks omitted). Here, the record contains nothing even to suggest that the Hopi Tribe was acting under the direction or control of the United States when it imposed a moratorium on Navajo development efforts. *See Goodrich*, 434 F.3d at 1334 (concluding that a third party could not be considered an agent of the United States for purposes of determining when a takings claim accrued because the United States did not control the third party's actions).

In codifying the mutual consent requirements, Congress was trying "to preserve the parties' rights subject to a final adjudication" of the tribes' respective interests in the Bennett Freeze area. *Masayesva*, 816 F. Supp. at 1397. The Navajo Nation points to no credible evidence indicating that the United States directed, or even encouraged, the Hopi Tribe to impose a moratorium on all Navajo Nation construction activities. To the contrary, Congress acted in 1988 to ameliorate some of the harsh effects of the Hopi moratorium by giving the DOI the right to approve Navajo construction projects to the extent such projects were deemed "necessary for . . . health or safety." Navajo and Hopi Indian Relocation Amendments Act of 1988, Pub. L. No. 100-666, § 6, 102 Stat. 3929, 3932

(amending 25 U.S.C. § 640d-9(f)).  Because the Hopi Tribe was not acting under the direction or control of the United States, or for its benefit, when it imposed the moratorium on Navajo development, its actions cannot be attributed to the United States for purposes of determining when any takings claim accrued.  *See B & G Enters. v. United States*, 220 F.3d 1318, 1324 (Fed. Cir. 2000) (concluding that California did not act as an agent of the United States when it enacted a law banning tobacco vending machines because the legislation "was not enacted for the benefit of the federal government").

## II.

We likewise reject the Navajo Nation's assertion that its cause of action did not accrue with passage of the 1980 Amendment because its claim was not "known and stabilized" at the time.  It is beyond cavil that a takings claim does not accrue until "the claimant knew or should have known that the claim existed."  *Goodrich*, 434 F.3d at 1333 (citations and internal quotation marks omitted); *see Nw. La. Fish*, 446 F.3d at 1290-92.  Here, however, it is clear that the Navajo Nation knew, long before the enactment of the 1980 Amendment, that it had no right to exclusive control of property within the Bennett Freeze area.  The record is replete with evidence that even prior to the 1980 Amendment the Hopi Tribe seldom granted approval for Navajo Nation construction activities.  Indeed, Glen Renner, the Director of the Navajo-Hopi Legal Services Program, testified that during the period of the administrative freeze, the Hopi Tribe approved only three of thirty-six Navajo development requests, including two that were conditioned on Navajo approval of Hopi projects.  Thus, if not before, as of July 8, 1980, when the 1980 Amendment was enacted, the Navajo Nation knew not only that it was statutorily prohibited from developing land within the Bennett Freeze area without Hopi Tribe

consent, but that the Hopi had rarely granted approval for Navajo development projects in the past. At this point, the Nation knew, or should have known, that it had been deprived of any right it may have had, under the 1934 Act, to exclusive control of land within the 1934 Reservation. *See Fallini*, 56 F.3d at 1380 ("The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."). Accordingly, even assuming *arguendo* that the 1980 Amendment, standing alone, was insufficient to cause any takings claim to accrue, the Amendment—coupled with the Navajo Nation's knowledge that the Hopi Tribe was unlikely to approve development within the Bennett Freeze area—was clearly sufficient to trigger the running of the limitations period.

While it is true that the Navajo Nation might not have reasonably foreseen that the Hopi Tribe would, in August 1982, decide to withhold approval for all—as opposed to most—of the Navajo Nation's construction projects, this court has "soundly rejected" the contention "that the filing of a lawsuit can be postponed until the full extent of the damage is known." *Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000). As *Fallini* makes clear, "it is not necessary that the damages from the alleged taking be complete and fully calculable before the cause of action accrues." 56 F.3d at 1382. Thus, even though a plaintiff might not be aware of the full economic cost of a taking at the time it occurs, for purposes of determining when the statute of limitations begins to run, the "proper focus" must be "upon the time of the [defendant's] acts, not upon the time at which the *consequences* of the acts [become] most painful." *Delaware State Coll. v.*

*Ricks*, 449 U.S. 250, 258 (1980) (citations and internal quotation marks omitted) (emphasis in original)).

Nor are we persuaded by the Navajo Nation's assertion that its claim did not accrue when Congress enacted the 1980 Amendment because it did not understand at that time that it no longer had the right to appeal to the DOI if the Hopi Tribe refused to consent to a development project. During certain periods while the administrative freeze was in effect, the Nation was granted the right to appeal to the DOI when the Hopi Tribe refused to approve a construction request.[5] When the 1980 Amendment was enacted, however, the Nation was given no such DOI appeal rights.[6] *See* 25 U.S.C. § 640d-9(f) (1980). At this point, the Nation was on notice that any DOI appeal rights it may previously have had had been curtailed. *See Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1572 (Fed. Cir. 1993) (refusing to apply a later accrual date where "all the relevant *facts* were known" and it was

---

[5]    From 1967 to 1970, public works projects could be submitted directly to the DOI for approval. In 1970, however, public works projects were again made subject to the mutual consent requirements. Development within Moenkopi and Tuba City was exempted from the mutual consent requirements in 1972. In 1976, the Navajo Nation was given the right to appeal to the DOI if the Hopi Tribe denied a Navajo construction request or refused to act on that request within thirty days of being asked to do so.

[6]    A Senate bill would have given the Navajo the right to appeal to the DOI if the Hopi denied a construction request. *See* Navajo and Hopi Relocation Amendments Act of 1979, S. 751, 96th Cong. § 3(e) (Oct. 24, 1979). The House bill, however, did not provide for any such appeal rights, and it was the House version of the bill that was ultimately enacted.

only "the meaning of the law that was misunderstood" (emphasis in original)).

## III.

Finally, we address the Navajo Nation's argument that its taking claim did not accrue until 2006, when a district court entered judgment adopting a settlement between the Navajo Nation and Hopi Tribe over title to the disputed land and terminated the requirement that each tribe obtain approval from the other tribe before engaging in development activities. *See Honyoama*, slip op. at 2-5. The Nation contends that the 1980 Amendment caused a temporary regulatory taking of its right to develop land in the Bennett Freeze area, and that the statute of limitations for a temporary regulatory takings claim does not run until the regulation at issue is no longer in force.

This court has previously rejected the notion "that the cessation of [a] regulation is a necessary condition to liability" of the United States for a temporary regulatory takings claim. *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed. Cir. 1998); *see also First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 320 (1987) ("It would require a considerable extension of [earlier Supreme Court] decisions to say that no compensable regulatory taking may occur until a challenged ordinance has ultimately been held invalid." (footnote omitted)). In *Bass*, for example, we explicitly rejected the argument that a plaintiff was required to wait until a regulation was no longer in effect before bringing a temporary regulatory takings claim. 133 F.3d at 896; *Caldwell*, 391 F.3d at 1234-35 (emphasizing that a takings claim accrues when the government deprives the plaintiff of a property interest, regardless of whether that taking is permanent or temporary); *Seiber v. United*

*States*, 364 F.3d 1356, 1364-66 (Fed. Cir. 2004) (concluding that a claim for a temporary regulatory taking accrued when the government issued a final decision denying a landowner's permit application, notwithstanding the fact that the regulation at issue was still in force). Indeed, our precedent requires "that temporary reversible takings [must] be analyzed in the same constitutional framework applied to permanent irreversible takings." *Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 641 (Fed. Cir. 1987); *see Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1583 (Fed. Cir. 1993) (explaining that "[t]he limited duration of [a] taking is relevant to the issue of what compensation is just, and not to the issue of whether a taking has occurred").

In certain situations, a claim for a temporary regulatory taking does not accrue when a regulation is enacted because the regulation itself is not a final governmental determination depriving a plaintiff of a compensable property right. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985); *see also Creppel v. United States*, 41 F.3d 627, 631-33 (Fed. Cir. 1994) (temporary regulatory takings claim accrued only after a district court ordered a land reclamation project to proceed). In *Boise Cascade Corp. v. United States*, for example, this court concluded that in situations where regulations require a landowner to obtain an environmental permit, a takings claim is not ripe until a governmental agency denies that landowner's permit application. 296 F.3d 1339, 1347 (Fed. Cir. 2002); *Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004) ("[W]hen an agency provides procedures for obtaining a final decision, a takings claim is unlikely to be ripe until the property owner complies with those procedures."). As the Supreme Court has made clear, "a takings claim challenging the application of land-use regulations is not

ripe unless the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001) (citations and internal quotation marks omitted).

No such ripeness concerns are present here. *See Goodrich*, 434 F.3d at 1334-35 (explaining that a takings claim is ripe when the government issues a final directive restricting a landowner's property rights). The 1980 Amendment was a final congressional directive prohibiting the Navajo Nation from developing land within the Bennett Freeze area without Hopi Tribe approval. If the 1934 Act granted the Navajo any right to exclusive control of property within the Bennett Freeze area, the 1980 Amendment unequivocally took that right away. The latest date, therefore, that any takings claim could have accrued was July 8, 1980.

## CONCLUSION

Accordingly, the judgment of the Court of Federal Claims is vacated and the case is remanded with instructions to dismiss the complaint.

## COSTS

No costs.

**VACATED AND REMANDED**